Kira A. Schlesinger (State Bar No. 205357)
SCHLESINGER CONRAD LAW FIRM
270 E. Douglas Avenue, Ste. 57
El Cajon, California 92020
Tel: 619-274-8058; Fax: 619-255-0758
E-Mail: atty@SchlesingerConrad.com

Carolyn Chan, Esq. (State Bar No. 147978)
2485 Notre Dame Blvd., Ste. 370
Chico, California 95928
Tel: 530-359-8810

*Attorneys for Plaintiffs David and Veronica Salinas, a married couple;
San Diego Puppy, a business entity*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

SAN DIEGO PUPPY, INC.,  a California
corporation;  DAVID SALINAS and
VERONICA SALINAS, husband and
wife;

     Plaintiffs,

v.

THE CITY OF SAN DIEGO, a
California municipality; SAN DIEGO
ANIMAL DEFENSE TEAM,  business
entity of unknown form; ANIMAL
PROTECTION AND RESCUE
LEAGUE,  a California 501(c)(3)
corporation; COMPANION ANIMAL
PROTECTION SOCIETY,  Delaware
non-profit corporation; BRYAN
PEASE, a California resident; SAN
DIEGO HUMANE SOCIETY,  a
California corporation; BLACK
CORPORATIONS 1 -100, inclusive;
WHITE PARTNERSHIPS, 1 – 100,
inclusive; and DOES 1-300, inclusive,

     Defendants.

Case No.  **'13 CV 2783 BTM DHB**

**VERIFIED COMPLAINT FOR
DECLARATORY JUDGMENT;
INJUNCTIVE RELIEF; AND
DAMAGES**



TABLE OF CONTENTS

PRELIMINARY STATEMENT AND BACKGROUND OF EVENTS. .................................. 2

AN IMPROPER COLLUSION BETWEEN COUNCILMEMBERS AND ACTIVISTS WAS BEHIND THE PROMULGATION OF THE ORDINANCE. ..................................................7

THE ORDINANCE ................................................................................................. 17

THE CITY HAS DEMONSTRATED IT PLANS TO ENFORCE THE ORDINANCE. .......... 22

PARTIES.............................................................................................................. 24

JURISDICTION AND VENUE................................................................................ 28

FIRST CAUSE OF ACTION (Declaratory Relief – Violation of Equal Protection)........... 28

SECOND CAUSE OF ACTION (Declaratory Relief – Violation of Due Process) ............. 32

THIRD CAUSE OF ACTION (Violation of the Commerce Clause) .................................. 35

FOURTH CAUSE OF ACTION (Violation of Business and Professions Code § 16700, *et seq.*)................................................................................................................... 38

FIFTH CAUSE OF ACTION (Violation of 42 U.S.C. § 1983) ............................................ 39

SIXTH CAUSE OF ACTION (Violation of 42 U.S.C. § 1985) ............................................ 42

SEVENTH CAUSE OF ACTION (Temporary Injunction and/or Temporary Restraining Order/Permanent Injunction) .................................................... 46

EIGHTH CAUSE OF ACTION (Trespass) ........................................................................48

NINTH CAUSE OF ACTION (Injunctive Relief/Temporary Restraining Order/Permanent Injunction Order)................................................................ 50

TENTH CAUSE OF ACTION (Violation of Business and Professions Code § 17200, *et seq.*)................................................................................................................... 54

ELEVENTH CAUSE OF ACTION (Nuisance) .................................................................. 57

TWELFTH CAUSE OF ACTION (Injunctive Relief – Violation of California Civil Code § 52, et seq. "Ralph Act")............................................................................................ 59

PRAYER ............................................................................................................... 60

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Plaintiffs San Diego Puppy, Inc. and David and Veronica Salinas (collectively, "San Diego Puppy") hereby submit the following claims against Defendant City of San Diego, Defendants San Diego Animal Defense Team, Animal Protection And Rescue League, Companion Animal Protection Society, Bryan Pease, San Diego Humane Society, and fictitiously named Defendants:

## Preliminary Statement and Background of Events.

1.     San Diego Puppy has been operating in the City of San Diego ("City") as a pet store selling healthy, regulated puppies since late 2011.

2.     San Diego Puppy is the only pet store in the City that is/was selling purebred and other high-quality puppies that are not purported to be from a rescue or shelter retail facility.

3.     The puppies at San Diego Puppy came from licensed and regulated breeders throughout the country, and were selected for their quality and health.

4.     The new ordinance, San Diego Municipal Code, Health & Safety Code Section 42.0706 ("Ordinance") was enacted after Salinas was quoted in the media as standing up for the freedom to choose a pet. The Ordinance purports to regulate the source of dogs offered to the public for purchase, and blatantly favors California non-profits over for-profit businesses.[1]

5.     The Ordinance deprives Plaintiffs of the right to sell dogs from any sources not preferred in the Ordinance, thus effectively depriving Plaintiffs the right to continue their business, and depriving Plaintiffs of their right to be treated equally under the law.

---

[1] The City of San Diego tendered a draft complaint to Plaintiffs shortly after the Ordinance was in force. That complaint was premised on unfair competition under Business and Professions Code § 17200, *et seq.* There was no criminal or other cause of action for violation of the Ordinance, *per se.*

6.     Until September 5, 2013, selling dogs at a pet store was legal under all applicable federal, state, county and San Diego city laws.

7.     The Ordinance was the result of animus that was fostered by activist organizations and coupled with the pre-existing antipathy on the party of certain City councilmembers.

8.     Activists manipulated the pre-existing animus on the part of the City councilmembers by providing exaggerated statistics and promoting sham rationales for the Ordinance in order to gain a market advantage.

9.     The bill was named the Companion Animal Protection Ordinance, despite the fact that the bill does not in any way purport to protect animals, but only bans the sale at pet stores with the purpose of encouraging sales at rescue and shelter retail facilities. *See* Comments by Dr. Weitzman, at ¶ 20, above.[2]

10.    Indeed, according to Alex Bell, a member of Ms. Zapf's staff who gave the introductory remarks at the July 9, 2013 council meeting:

> The goal of this ordinance is to make San Diego a humane city, by joining the twelve California cities, including Los Angeles and Chula Vista, who have already adopted similar ordinances. **While this originated from a desire to stop the inhumane importation of puppy mill puppies, cats and rabbits, the City's role in this is really consumer protection for San Diegans**. It is aimed at stopping unsuspecting customers from buying animals that are poorly bred, have genetic health problems and behavioral problems. As you will see in the working group presentation, **puppy mill puppies have higher instances of health and behavioral problems** which can often add up to unforeseen costs for customers.[3]

---

[2] The statements were made at the July 9, 2013 public hearing which can be accessed at http://granicus.sandiego.gov/MediaPlayer.php?view_id=3&clip_id=5847.

[3] http://granicus.sandiego.gov/MediaPlayer.php?view_id=3&clip_id=5847 (2:26:32-39) (emphasis added).

SCHLESINGER
CONRAD
LAW FIRM

11.     This ignores well-established California law, and the guarantees to purchasers from pet stores.  Moreover, Carlsbad City Council recently concluded after conducting an investigation independent from the Activists canned assertions, only a small number of breeders appear to be unethical, and pet stores are not the problem.

12.     In addition to the puppy lemon laws in place, pet store puppies – unlike shelter dogs – come with guarantees of health.  *See* Lockyer-Polanco-Farr Pet Protection Act.  A true and correct copy of the San Diego Puppy Guarantee is attached hereto as Exhibit 1 and made a part of this Complaint.

13.     Animal activists have been around at least since 1933, when the Tierschutzgesetz, or animal protection law, was introduced in Germany.  In the 1970's writers and activists formed the Animal Liberation Front, which came to the attention of Homeland Security as recently as 2005.

14.     By 2006, the Humane Society of United States' ("HSUS") lobbyist Wayne Pacelle was so deeply entrenched in governmental affairs that the bulk of HSUS funds – at least 98% – raised under the guise of helping homeless pets, were actually retained in the central HSUS organization in Washington.[4]  Out of the $133,577,658 in total annual revenue[5] reflected on the 2011 HSUS Form 990, HSUS paid salaries and "other compensation" of $37,788,110, professional fund raising of $4,343,746 and over $11,000,000 on advertising.

15.     While the name "Humane Society" is attached to numerous shelters, upon information and belief, HSUS gave exactly zero ($0.00) to any affiliate.[6]

---

[4] http://www.humanewatch.org/images/uploads/DeceptiveFundraisingPracticesofHSUS.pdf (visited 10/31/2013)

[5] $122,743,278 of that from "contributions and grants", and $2,735,672 from "program service revenue" .  http://www.guidestar.org/FinDocuments/2011/530/225/2011-530225390-08c39a19-9.pdf (visited 10/23/2013).

[6] HSUS Washington DC's 2011 990 Form



SCHLESINGER
CONRAD
LAW FIRM

16.     HSUS had total reported net assets and fund balances of $183,215,830 in 2011.[7]

17.     Many shelters and/or rescues purchase dogs from "puppy mill auctions".[8]  Others import dogs from Mexico or Romania.[9]  Indeed, as many as 300,000 puppies a year are being imported, based on early estimates from 2007, according to G. Gale Galland, veterinarian in the Center for Disease Control's Division of Global Migration and Quarantine.[10]

18.     The Border Puppy Task Force in California estimates that 10,000 puppies entered San Diego County from Mexico in just one year. Upon information and belief, some of these were only a few weeks old. *Id.*

19.     Purchases by retail shelter or retail rescue organizations are made with funds collected from, *inter alia,* donations and "rehoming" fees.

20.     Dogs in retail shelter or retail rescue facilities are frequently misidentified as one breed or another, with little idea what the lines or breeding behind the dog actually might be.[11]

21.     Many shelters, including San Diego County Animal Control shelters have a surplus of Pit Bulls and Chihuahuas, the latter likely are the result of importation from Mexico.  According to the San Diego Animal Welfare Coalition statistics for 2012-2013, the number of dogs at the County

---

http://www.guidestar.org/FinDocuments/2011/530/225/2011-530225390-08c39a19-9.pdf (visited 10/23/2013).

[7] http://www.guidestar.org/FinDocuments/2011/530/225/2011-530225390-08c39a19-9.pdf

[8] http://www.petfinder.com/shelters/IN390.html ; http://www.petfinder.com/shelters/mi542.html

[9] http://www.bajadogrescue.org/about-us/ ; *see also* http://www.allcitydogs.go.com/indexmain.php?city=Salinas&state=ca&sname=_California

[10] http://abcnews.go.com/Health/Story?id=3765973&page=1 (visited 11/5/2013).

[11] "Even though we're calling them German shepherd mixes, they're probably not," said Lisa Czarniak, lead animal care technician at Helen Woodward. http://legacy.utsandiego.com/news/northcounty/20070627-9999-1mc27pups.html

1  of San Diego Animal Shelters included 111 transferred in from other cities,
2  and 44 that died or were "lost" in shelter custody.

3  22.    In either the county or retail shelter/rescue scenario, puppies
4  tend to be more expensive than older dogs, and title to dogs is transferred
5  only after payment by the purchaser.

6  23.    Upon information and belief, the City does not track the number
7  of dogs returned to shelters by prior purchasers.  However, at least one
8  study reports that 50% of all dogs relinquished for behavioral problems
9  were adopted from a shelter.[12]  In California, 38% of the dogs relinquished
10  to shelters are released for behavioral reasons.  *Id.*

11  24.    Typically, owners that return dogs do so within three months of
12  "rescuing" them from shelters.  Of course, raising a puppy allows an owner
13  to train it and modify its behavior more easily than is often possible with an
14  older dog that has been mistreated previously. As stated by Salmon, *et al.*
15  *supra* at fn. 8*,* dogs relinquished for behavioral reasons tend to be older.

16  25.    San Diego Puppy does not buy dogs at auction or import dogs
17  from other countries.

18  26.    San Diego Puppy handles only puppies from licensed, regulated
19  and inspected U.S. breeders.

20  27.    No evidence exists that puppies from San Diego Puppy end up in
21  shelters.

22  28.    The dogs from San Diego Puppy are microchipped, so should
23  one be picked up by a shelter, it can be identified and returned to its owner.

24

25  [12] JOURNAL OF APPLIED ANIMAL WELFARE SCIENCE, 3(2), 93–106, Salman, Mo, et
26  al.  Copyright © 2000, Lawrence Erlbaum Associates, Inc. ("Owners relinquishing a dog
     for behavioral reasons only were more likely to report having acquired a dog from a
     shelter (50%) . . . . There is a strong association between the addition of a dog from a
27  shelter and the relinquishment of a dog to a shelter for behavioral reasons. Therefore, an
28  intervention strategy for educating owners and training dogs in a shelter environment
     may contribute to the reduction of relinquishment.")



29.     Should an owner choose not to keep a puppy purchased from San Diego Puppy, the company will assist with re-homing so that there is no need to release the puppy to a shelter.  There is no requirement that San Diego Puppy take these extra steps, but they do.

30.     San Diego Puppy, along with a sister store operating legally in Oceanside, California, is the primary source of income for Plaintiffs David and Veronica Salinas, as well as the employees of San Diego Puppy.  San Diego Puppy is a registered California corporation and all business and other licenses for San Diego Puppy are current.

**An Improper Collusion Between Councilmembers and Activists was Behind the Promulgation of the Ordinance.**

31.     At least as early as 2012, unbeknownst to Plaintiffs, CAPS began a concerted scheme to obtain a ban on pet stores in San Diego.  To do so, upon information and belief, CAPS worked in concert with Animal Protection and Rescue League ("APRL"), Bryan Pease, San Diego Humane Society and SPCA and San Diego Animal Defense Team (collectively "Activist Defendants"), and with a "playbook" put out by HSUS.  That playbook is formally captioned "A Guide to Using Local Ordinances to Combat Puppy Mills".

32.     Among the tactics recommended by the HSUS playbook is that the group trying to change legislation "find a friend in office."

33.     Consistent with that directive by HSUS, upon information and belief, CAPS and other Activist Defendants selected two council members with known antipathy toward pet sales, Marti Emerald and Lori Zpaf.

34.     Upon information and belief, at the Activist Defendants' urging, Marti Emerald and Lori Zapf as chair and vice-chair, respectively, used their Public Safety and Neighborhood Services Committee as a base to create a "working group".  Upon information and belief, the working group was comprised solely of Defendant Activists, and headed by Emerald and Zapf.

Upon information and belief, the sole purpose of the working committee was to formulate a plan to shut down San Diego Puppy, the only pet store selling dogs that did not work with the Activist Defendants, or any of them.

35.     On or about May 1, 2013, Emerald introduced the proposal to ban the transfer of dog ownership of any dog that was not from a non-profit, the county or a "humane society."

36.     The Ordinance as proposed is part of the City's Health and Safety Code, and facially and actually acts as a market regulator in that it prohibits sales of dogs from any out-of-state breeder by any for-profit corporation, while giving *carte blanch* to California non-profits, humane societies or county shelters to obtain dogs from anywhere without the City of San Diego asking any questions regarding the origin or source of the dog.

37.     Councilwoman Emerald is quoted in the news as stating erroneously and inappropriately that "unsuspecting consumers here in San Diego and in other places also pay the price" of purchasing offspring of unhealthy, inbred dogs from substandard breeding facilities, dubbed "puppy mills" by activists. She also stated without any basis in fact as applied to San Diego Puppy that "[c]onsumers are coming in, they're paying top dollar for these animals," said Emerald.  "Then they get the dogs home and they get sick, and the vet bills start rolling in."[13]  She cited no authority, facts or statistics for her incorrect assertions.

38.     As pointed out by Mike Canning, president and CEO of the Pet Industry Advisory Council, puppies in a retail setting are regulated from the time they are bred until they are sold.  According to Mr. Canning, the San Diego proposal would have the "unintended consequence" of making pet transactions fully unregulated.  This is true because purebred dogs are rarely

---

[13] http://fox5sandiego.com/local-news/stories/city-considers-pet-store-ban-on-dog-cat-rabbit-sales/#ixzz2ggSOMKeK (visited 11.22.2013).



available through the shelter retail facilities mandated by the Ordinance, and purebred puppies are essentially non-existent in such facilities. Accordingly, prospective pet purchasers would be forced to look at potentially unregulated sources.

39.    San Diego Puppy offers a return guarantee if any puppy is found to be ill.  As a separate service, San Diego Puppy also offers assistance in re-homing the puppy if the purchaser decides they do not want to keep the puppy for any reason.  All of San Diego Puppy's dogs are microchipped and, thus, identifiable should they ever become lost and picked up by animal control or taken to the county. While California law and the Uniform Commercial Code mandate the full warranty and other guarantees, there is no requirement that San Diego Puppy assist with re-homing or microchipping the puppies.

40.    California's Lemon Law and the Uniform Commercial Code ("UCC") and other state laws apply to retail sales such as those by San Diego Puppy.  These laws do not apply to county or non-profit retail sales.

41.    Upon information and belief, sellers claiming to be non-profit organizations do not pay sales tax on the money they collect from purchasers.

42.    At the initial hearing on this matter on or about May 1, 2013, there was a prepared presentation by those in favor of the ban, *i.e.,* those in the working group.  That presentation was originally to run for only ten (10) minutes.[14]  However, Emerald, acting for the City Council, permitted the pro-ban contingent to go on for an additional ten minutes.

43.    Opponents were only permitted to speak after providing their names, and then were given three minutes.  At the end of that time, regardless of how many interruptions resulted from the proponents' shouts,

---

[14] http://granicus.sandiego.gov/MediaPlayer.php?view_id=15&clip_id=5752



claps, boos and taunts, speakers in opposition were abruptly cut off at the close of that three minutes.

44.   Conversely, upon information and belief, numerous speakers in favor of the ban were permitted more than the allotted three minutes.

45.   Councilwoman Emerald announced the May 1, 2013 meeting by stating that there was a "working group looking at our municipal code and a possible amendment that would prohibit the sale of dogs, cats, rabbits and so forth in pet shops, retail business or other commercial establishments that come from puppy mills."[15]

46.   The working group included Councilwoman Zapf and Gary Weitzman, president and CEO of the San Diego Humane Society.  The balance of the working group was comprised of representatives from Companion Animal Protection Society, Animal Defense Team, Animal Protection and Rescue League (collectively "Working Group").

47.   Upon information and belief, the Working Group did not include any individuals or groups opposed to such a ban.  Upon information and belief, the opponents of the ban were not apprised of nor invited to join this Working Group.

48.   Weitzman stated that the point of the ban is to prohibit the sale of dogs and puppies, cats and kittens in "commercial retail establishments." He acknowledged that purebred dogs are often not found in shelter or rescue environments. ("sometimes you can get them there, but not always"). The stated purpose, according to Weitzman, was also to discourage the transport and import of dogs from unregulated sources, including importation from Mexico.  Weitzman stated that the point was "not to decrease euthanasia necessarily or to increase adoptions."  He described

---

[15] http://granicus.sandiego.gov/MediaPlayer.php?view_id=15&clip_id=5752  (at 1:06:25, et seq.)



1    these goals as "side benefits".   The proponents of the ban stated explicitly

2    that these retail shelter or retail rescue businesses represent a "viable

3    business model."

4         49.    According to publically filed documents, some of these non-

5    profit operations realize proceeds in excess of $499,000 annually.  The San

6    Diego Humane Society and SPCA, for example, had net assets in 2011 of

7    $60,092,035, with $17,776,734 in revenue for that year alone.

8         50.    Humane Society of the United States acknowledged revenue in

9    2011 in excess of $183,000.[16]

10        51.    Even a small non-profit such as "Homeward Bound CSP, Inc."

11   had net assets at the beginning of 2011 of $72,988.  Upon information and

12   belief, these figures come from contributions and "program services" such as

13   the transfer of dogs to purchasers.

14        52.    With more than 750 "rescue" operations listed on the IRS.gov

15   site in California alone,[17] and more than 300 believed to be operating in San

16   Diego, these corporations -- with names like "Animal Rescuers Without

17   Borders Inc.", "Baja Animal Sanctuary", "No Wagging Tail Left Behind",

18   "Heart Bandits American Eskimo Dog Rescue", "Saving Pets One at a Time"

19   and "Pacific Animal Rescue and Sanctuary" -- are big business. [18]

20        53.    Upon information and belief, many of the retail shelter or retail

21   rescue organizations, including "Pacific Animal Rescue and Sanctuary", or

22

23   [16]  http://www.humanewatch.org/hsus-sheds-crocodile-tears-while-rescues-close/;  *See also* Form 990 filed by HSUS for 2001

24   (http://www.guidestar.org/FinDocuments/2011/530/225/2011-530225390-08c39a19-9.pdf)

25   [17] These are just the 501(c)(3) corporations with "rescue" in their names.

26   http://apps.irs.gov/app/eos/pub78Search.do?ein1=&names=rescue+&city=&state=CA&country=US&deductibility=NONE&dispatchMethod=searchCharities&submitName=Search (visited 10/23/2013).

27

28   [18]  http://www.guidestar.org/FinDocuments/2012/951/661/2012-951661688-08e3e4f5-9.pdf



1  "Small Paws Rescue, Inc.", are not even California corporations or

2  authorized to do business in California.  Small Paws Rescue, Inc., for

3  example, is an Oklahoma corporation.

4       54.    The California Department of Corporations links Small Paws

5  Rescue, Inc., to an entity called "Frosty Paws and Friends, Small And

6  Medium Breed Dog Rescue, Inc.", a suspended corporation.  Small Paws

7  Rescue, Inc. is listed as a non-profit out of Tennessee.

8       55.    "UCARE Rescue Group" asks people to send money to an Elk

9  Grove, California address, but it is not registered as a California corporation.

10 Rather, they are a Texas corporation.

11      56.    The ironically titled "Heart Bandits" is not a California

12 corporation, despite a website that asks people to send money to a post

13 office box in Fresno, California.  Heart Bandit's website asserts the company

14 is an Ohio Corporation, complete with articles of incorporation posted on

15 their website.

16      57.    The Ohio Secretary of State does not list "Heart Bandits" as an

17 Ohio corporation, non-profit or otherwise.  Indeed, the articles of

18 incorporation state that Mr. Ronald K. Nims is the sole incorporator.  Nims

19 is an attorney in Ohio with dozens of for-profit corporations, but Heart

20 Bandits is not among them.  This is particularly curious since the IRS

21 apparently believes that Heart Bandits is in Fresno, California.  Despite the

22 many questions regarding their status, each of these corporations and

23 entities are included as rescue "partners" with the City of San Diego. See

24 Exhibit 2, attached hereto and made a part of this Complaint.

25      58.    None of the dogs at San Diego Puppy come from "puppy mills"

26 or from substandard breeders of any type.

27      59.    There is no statutory definition of "puppy mill".  Upon

28 information and belief, the term is one that was coined by activists.  It is

SCHLESINGER
CONRAD
LAW FIRM

applied indiscriminately to any breeding program. It is consistently used as a pejorative term for any breeder – regardless of number of breedings or quality or care – and applied with special venom to breeders located in the Midwest.

60.   At the July 9, 2013 reading of the proposed Ordinance, opponents were again restricted in their ability to present coherent arguments against the ban.

61.   Following presentations by the working group of activists, opponents of the ban were given one (1) minute to speak.

62.   During this brief time, the comments of opponents to the ban were frequently interrupted by vocal proponents of the ban. These unruly proponents were not controlled or asked to leave by the council. It was in that climate that San Diego adopted the ordinance currently known as San Diego Municipal Code 42.0706, a Health and Sanitation Ordinance in the San Diego Municipal Code. A true and correct copy of the SD Municipal Ordinance is attached hereto as Exhibit 3 is attached hereto and made a part of this Complaint.

63.   Upon information and belief, and consistent with the City's policy and/or custom, prior to the adoption of the Ordinance, neither the City nor the City Council had completed an independent study regarding either the number of purebred dogs in the local shelters, the number of independent breeders or number of breeder sales, or the percentage of microchipped purebred dogs in the local shelters.

64.   Upon further information and belief, and consistent with the City's policy and/or custom, prior to the adoption of the Ordinance, neither the City nor the City Council had conducted an independent investigation into the conditions in shelters, the handling and/or maintenance of dogs in



1    such shelters, the re-relinquishment rates of shelter dogs, or the source of

2    the shelter dogs.[19]

3        65.    Upon information and belief, and consistent with the City's

4    policies and/or custom, prior to the adoption of the Ordinance, neither the

5    City nor the City Council had looked at the profit being made by retail

6    shelter and rescue groups in the San Diego area from the importation and

7    sale of dogs.

8        66.    Although various activist groups claim that puppies are available

9    from shelters for between $35 to $65, in reality the prices are frequently

10   between $175 to $225, per dog, with puppies being most expensive.  True

11   and correct copies of photographs with signs by protesters asserting $35

12   puppies and exemplar listings from actual San Diego County shelters

13   showing higher prices are attached hereto as Exhibit 4, and made a part of

14   this Complaint.

15       67.    The activist groups indiscriminately mingle these cheap puppy

16   signs with disparaging and erroneous assertions that San Diego Puppy sells

17   puppies from substandard breeders or, in activist parlance, "puppy mills."[20]

18       68.    Upon information and belief, there are more than 300 different

19   retail shelter or retail rescue facilities already selling pets in the San Diego

20   area.  Upon further information and belief these organizations are not

21

22

---

[19]  While some statistics exist as to the number of dogs in the county shelters from the public, there are dogs that are brought into county shelters from "San Diego Animal Welfare Coalition", but it is not clear exactly who is in the "coalition."  The term "San Diego Animal Welfare Coalition" leads directly back to the San Diego Humane Society and SPCA ("SDHumane") website.   That entity's principal officer is Gary Weitzman, who was part of the Working Group.  SDHumane had revenue in 2011 of $17,776,734, and paid salaries and benefits in the amount of $12,607,438 during that same year.

[20]  Apparently, the activists feel that price is the determinative factor in selecting a pet, an animal that should be a life-long commitment for the purchaser, and one that will entail various significant costs over its life.  They apparently fail to consider how someone who can only afford $35 for the purchase of a pet can afford to care for the pet properly, and fail to consider the costs associated with the high rate of re-relinquishment of shelter pets.



1  inspected regularly and are neither licensed nor regulated as breeders or pet

2  stores.

3      69.    In San Diego County, retail shelter or retail rescue facilities

4  import dogs from foreign countries such as Mexico and/or Romania.  *See*

5  Publications by Baja Rescue and ABC Chanel 10 News.  A true and correct

6  copy of the Channel 10 news item is attached hereto as Exhibit 5, and made

7  a part of this complaint. A true and correct copy of the Baja Rescue "About

8  Baja Dog Rescue" is attached hereto as Exhibit 6 and made a part hereof.

9      70.    Although California has one of the strictest "Lemon Laws" in the

10  country (Cal. Health & Saf. C. § 122160), the law does not apply to dogs from

11  retail shelter or retail rescue organizations.  *See* Cal Health & Saf. C. §

12  122125(d) ("This article shall not apply to publicly operated pounds and

13  humane society").

14      71.    The California Health and Safety Code, §§ 122125-122220

15  regulating the care and handling of dogs for sale (Lockyer-Polanco-Farr Pet

16  Protection Act) does not apply to retail shelter or retail rescue facilities.  Cal

17  Health & Saf. C. § 122125(d).[21]  Conversely, these laws do apply to San Diego

18  Puppy.

19      72.    Prior to the passage of the Ordinance, pet stores were highly

20  regulated.  The retail shelter or retail rescue facilities in San Diego are, to a

21  large degree, unregulated.[22]

22      73.    Upon information and belief, San Diego Puppy was the only pet

23  store regularly selling purebred puppies that are under six months of age in

24  the City of San Diego.

---

[21] The primary mandate appears to be that shelter dogs be spayed or neutered.  *See* Food & Agr. Code, § 30503.

[22] The primary exception to this seems to be the mandatory spay and neuter requirements.  See Food and Agriculture Code § 30501.

SCHLESINGER CONRAD LAW FIRM

74.    The puppies at San Diego Puppy came from licensed breeders, and such puppies are regulated from the time they are bred through the date of sale.  Even after they are sold, laws are in place to both prevent strays and prevent inhumane treatment of dogs.  *See, e.g.,* Cal. Pen. C. 597; licensing laws relating to dogs owned by San Diego residents.

75.    Further, and based upon the statements at the City Council meeting when the Ordinance was finally introduced to the public, it is clear that a significant number of the City Councilmembers have considerable animus against any puppy sales and purebred dogs.  That animus was particularly directed at San Diego Puppy.

76.    At the July 9, 2013 meeting, Zapf stated that in March the council heard a presentation from the Companion Animal Protection Society ("CAPS") about banning pet stores.  She then stated that this was an "issue that is near and dear to me" because she had recently adopted a rescue dog, and had two staff members that had adopted a dog—one from an "out of state puppy mill"—that had health problems.  It was on this basis that she agreed to form the Working Group.  According to Zapf, that group was made up of the City Attorney's Office, CAPS, the San Diego Humane Society, Animal Defense Team, as well as the Animal Protection and Rescue League, all came together to draft an Ordinance.  It was then presented to the committee.

77.    According to Zapf, it was Emerald who "kicked off the discussion in her committee."  Zapf stated that Emerald is "a very strong supporter of this issue."

78.    The failure to listen to or include any representative that was not associated with an activist agenda shows the City's disdain for any opposing views and further demonstrates the general animus of the City toward pet stores.



79.    Later media reports indicate that "The San Diego Animal Defense Team" ("ADT") had been "meeting with Mayor Bob Filner and the San Diego City Council to enact an ordinance that will ban the retail sales of puppies, kittens and rabbits."[23]

80.    Upon information and belief, the retail shelter or retail rescue organizations are well aware that not all pet stores sell dogs from substandard breeders, and further that their actions to ban pet stores yield a significant economic advantage for any retailer doing business as an alleged retail shelter or retail rescue facility.  These facilities, in turn, are believed to contribute back to SDHumane and HSUS.  It is this economic advantage, also realized through public contributions, donations and "rehoming fees" that motivates the ban on pet stores.

81.    This economic advantage is reflected in the comments of Weitzman in San Diego and another HSUS representative in Oceanside, when they stated that: (1) the "humane" model is a viable business model; and (2) the San Diego Ordinance's primary goal was to increase sales at commercial establishments using the business model that is tied into and promoted by the activist groups. *See* Weitzman's comments, *supra,* at ¶ 20.

### The Ordinance

82.    The City Council ultimately passed an Ordinance on August 5, 2013 ("Accepted Ordinance"), Ordinance No. O-20280, in pertinent part:

> WHEREAS, the **Companion Animal Protection Society presented a report to the Committee** on Public Safety and Neighborhood Services (PS&NS) on March 13, 2013; and
>
> . . .

---

[23] http://www.examiner.com/article/san-diego-may-be-next-city-to-ban-retail-sales-of-animals-endorsements-needed (visited 10/8/13)



WHEREAS, the need exists to regulate pet shops, retail businesses, and other commercial establishments that sell companion animals; and . . .

WHEREAS, **according to the Humane Society** of the United States, hundreds of thousands of dogs and cats in the United States have been housed and bred at substandard breeding facilities known as "puppy mills" or "kitten factories" that mass-produce animals for sale to the public, and **many of these animals are sold at retail in pet shops**; and

WHEREAS, because of the lack of proper animal husbandry practices at these facilities, animals born and raised at these "puppy mills" and "kitten factories" are more likely to have genetic disorders and lack adequate socialization, while breeding animals utilized there are subject to inhumane housing conditions and are indiscriminately disposed of when they reach the end of their profitable breeding cycle; and

WHEREAS, **prohibiting the unregulated sale of companion animals in pet shops**, retail businesses, or other commercial establishments *may* **lower the sale of dogs and cats from inhumane "puppy mills" and "kitten factories,"** *may* **lower the shelter animal euthanasia rate,** and lead to a greater adoption rate of shelter animals; . . .

WHEREAS, the City seeks to prohibit the sale of companion animals in pet shops, retail businesses, and commercial establishments unless the animals are obtained from a city or county animal shelter or animal control agency, humane society, or non-profit rescue organization; and

WHEREAS, the **PS&NS Committee**, after hearing the testimony and evidence presented, **directed a working group of animal organizations**, City staff, and the City Attorney's Office to draft an ordinance regulating the sale of companion animals in pet shops, retail businesses, and commercial establishments; and

§42.0706 Pet Shops - Prohibition of the Sale of Dogs, Cats, and Rabbits

(a) It is unlawful for any person <u>to display</u>, offer for sale, deliver, barter, auction, give away, transfer, or sell any live dog, cat, or rabbit in any pet shop, retail business, or other commercial establishment located in the City of San Diego, unless the dog, cat, or rabbit was obtained from a city or county animal shelter or



SCHLESINGER CONRAD LAW FIRM

animal control agency, **a humane society**, or a **non-profit rescue organization**. All pet shops, retail businesses, or other commercial establishments selling dogs, cats, or rabbits shall maintain a certificate of source for each of the animals and make it available upon request to animal control officers, law enforcement, code compliance officials, or any other City employee charged with enforcing the provisions of this section.

(1) For purposes of this section, a *commercial establishment* is defined **as any for-profit business enterprise, including a sole proprietorship** engaged in retail or wholesale commerce related to dogs, cats, and rabbits, including grooming parlors, canine day care, and boarding facilities.

(2) For purposes of this section, a *non-profit rescue organization* is defined as any **California non-profit** corporation that is exempt from taxation under Internal Revenue Code section 501(c)(3), whose mission and practice is, **in whole or in significant part**, the **rescue** and **placement** of dogs, cats, or rabbits; or any **non-profit organization that is not exempt from taxation under Internal Revenue Code section 501 (c)(3)** but is currently an active **rescue partner** with a City or County of San Diego shelter or **humane society, whose mission is, in whole or in significant part, the rescue and placement** of dogs, cats, or rabbits.

(3) For purposes of this section, a *certificate of source* is defined as any document from the source city or county animal shelter or animal control agency, **humane society,** or *non-profit* rescue organization declaring the source of the dog, cat, or rabbit on the premises of the pet shop, retail business, or other *commercial establishment*. (bold and underline emphasis added; italics original). *See* Exhibit 7 (Ordinance as Passed on August 5, 2013, attached hereto and made a part of this Complaint as though fully set forth.)

83. Thus, the Ordinance looks to the form of the seller first. If it is a non-profit with its "mission and practice is, in whole **or in significant part**, the rescue and placement of dogs, cats, or rabbits", the source of the pet is never considered. The Ordinance states that this is equally true if the "*commercial establishment*"—defined so as to include anyone selling a dog

/ / /

1   for profit—is not, in fact, a non-profit, so long as it is partnered with the City

2   or County of San Diego shelter or humane society.

3       84.   Despite the language in the Ordinance, in order to become a City

4   partner, the organization must be a 501(c)(3) status or state nonprofit

5   corporation status.  This option is not available to a for-profit pet store,

6   regardless of the benefits the pet store may offer, or the degree of

7   compliance with the City's stated goals.

8       85.   A for-profit pet store could not, under this Ordinance, become a

9   City Partner, even if it was willing to devote 90% of its retail space to selling

10  shelter dogs.  Attached hereto as Exhibit 8 and incorporated by reference is

11  a true and correct copy of the County of San Diego Department of Animal

12  Services Rescue Partner Information and Application, which clearly states

13  that only 501(c) that "[t]he Department of Animal Services partners with

14  only those organizations that have a 501(c)(3) status or state nonprofit

15  corporation status."  Thus, the Department of Animal Services looks first to

16  the corporate form, and considers it a determinative factor in forming

17  partnerships related to animals.

18      86.   The Ordinance is internally inconsistent and vague.  First, it

19  states the source must be from a non-profit ("a *non-profit rescue*

20  *organization* is defined as any **California <u>non-profit</u>** corporation that **<u>is</u>**

21  **<u>exempt</u>** from taxation under Internal Revenue Code section 501(c)(3)").

22  Next it states that the source could be from a "non-profit" that is "not

23  exempt" from paying taxes.  It is not clear if the corporation must be a

24  California corporation or one that is registered in California as a foreign

25  corporation, or merely one that is operating in California.

26      87.   Further, the Ordinance permits the sale of dogs from a "humane

27  society, whose mission is, in whole or in significant part, the rescue and

28  placement of dogs, cats or rabbits."  The Ordinance states the "rescue" must



1   engage "in whole or <u>significant part</u>, [in] the <u>rescue</u> or placement of dogs,

2   cats, or rabbits".  But the phrase "significant part" is not defined.  The

3   definition conflicts with Food and Agriculture Code § 30503's definition of

4   "rescue" in that § 30503 requires only "at least one of [the organization's

5   purpose] being the sale or placement of dogs that have been removed from a

6   public animal control agency or shelter . . . or that have been previously

7   owned by any person other than the original breeder of that dog".  Under

8   the Ordinance definition, therefore, the term "rescue" remains ambiguous.

9   If we presume we are to use the definition in the Food and Agriculture Code,

10  anyone that resells a previously owned dog would qualify.  Without any

11  specific definition as to the terms "significant part" or "rescue", the

12  Ordinance is unclear and overly subjective.

13          88.     According to a press release on the CAPS website, CAPS is the

14  entity that proposed the Ordinance, and the group had worked with the City

15  for a year before the Ordinance was passed.  This means that the City failed

16  to disclose its intentions until the Ordinance was drafted and, essentially, a

17  *fait accompli.*  Specifically, the CAPS website states:

> CAPS formally introduced the ordinance on March 13, but talks between the **City of San Diego and the non-profit began back in June 2012**. Other animal welfare organizations joined forces later on to assist in the effort. This will be CAPS' fifth successfully introduced and passed ordinance of its kind and the 32nd city in the US with anti-puppy mill legislation.
>
> '<u>We got the ordinance we wanted.</u> Getting it passed has been hard work but when I come home and look in the eyes of my little puppy mill dog, it makes me happy to have participated in making the sale of puppy mill dogs illegal in my city,' said Sydney Cicourel, San Diego campaign coordinator for <u>CAPS, who's been working on the ordinance for more than a year</u> with the committee.[24] (underlining original; bold emphasis added).

---

[24] http://www.caps-web.org/outreach/press-releases



89.    As adopted, the Ordinance states:

> (a) It is unlawful for any person to display, offer for sale, deliver, barter, auction, give away, transfer, or sell any live dog .. , in any pet shop, retail business, or other *commercial establishment* located in San Diego, unless the dog . . . was obtained from a city or county animal shelter or animal control agency, a **humane society**, or a *non-profit rescue organization*.
>
> 1.  For purposes of this section, a *commercial establishment* is defined as **any for-profit business** enterprise, including a sole proprietorship engaged in retail or wholesale commerce related to dogs . . . .

*See* Exhibit 2, attached hereto and incorporated by reference.

**The City has Demonstrated it Plans to Enforce the Ordinance.**

90.    On September 19, 2013, the City Attorney's office sent San Diego Puppy's landlord, Daniel Smith, a letter asserting he was subject to charges for "aiding and abetting" should Mr. Smith continue to honor the three year contract with San Diego Puppy.  A true and correct copy of that letter is attached hereto as Exhibit 9 and made a part of this Complaint.

91.    On October 1, 2013, Plaintiffs and counsel met with the City Attorney's office to discuss this matter.  During that meeting, a San Diego Deputy City Attorney specifically stated that there was no health or safety issue with San Diego Puppy's dogs.  Nevertheless, Plaintiffs were provided draft copies of: (1) Complaint for Injunction, Civil Penalties and Other Equitable Relief; (2) Stipulation for Issuance of Preliminary Injunction; and (3) Stipulated Preliminary Injunction.  In subsequent conversations, the Deputy City Attorney stated that the City Attorney's office will file a version of that complaint as soon as all evidence has been assembled.  The tenor of these comments was that the filing was imminent.[25]   True and correct

---

[25] In an abundance of caution, Mr. Salinas moved his puppies to his Oceanside store. The San Diego Puppy store is still under lease.  However, because Oceanside recently



copies of the Draft Complaint for Injunction, Civil Penalties and Other Equitable Relief; Draft Stipulated Preliminary Injunction; and Draft Stipulation for Preliminary Injunction are attached collectively hereto as Exhibit 10, and made a part of this complaint.

92.    The initial claim for relief asserted by the City in the Draft Complaint is not that San Diego Puppy is violating the Ordinance.  Rather, it is that San Diego Puppy is allegedly engaged in unfair competition pursuant to Business & Professions Code § 17200, and more particularly § 17203 and § 17206.   This claim by the City is strong evidence that the activists are, in truth, seeking a monopoly.[26]  Further, it is strong evidence that the City regards San Diego Puppy and the retail shelter or retail rescue organizations as competing in the same market.[27]  The simplest explanation, particularly

---

declined to enact a ban on pet stores and there was a real fear that animal control would try to take the puppies from San Diego Puppy, they were moved.  Plaintiff understands that if he moves his puppies back to the San Diego Puppy store in San Diego, prosecution will follow immediately thereafter.

[26] Indeed, a neighboring city council for Carlsbad, California, recently enacted and then repealed a very similar ordinance.  Councilwoman Farrah Douglas specifically stated she was "frustrated the activists had trumped up claims against the [existing Carlsbad pet store] to further their own mission."  She is also quoted as stating "It's not the pet stores who are troublemakers, it's the breeders."  Douglas is also reported as noting that only a small number of breeders appeared to be unethical. http://www.utsandiego.com/news/2013/nov/06/carlsbad-puppy-mill-ordinance-repealed/ (visited 11/6/2013).  San Clemente determined that no pet store ban was appropriate as pet stores are not a problem.  As San Clemente Councilman Bob Baker stated: "Perfectly acceptable dogs come from pet stores."  Councilman Jim Evert is quoted as saying: "How can we establish things to force people to go to the pet shelter?" . . . It just doesn't seem American to me. A puppy mill is a breeder that puts out a lot of puppies. It could be any breeder."  http://www.ocregister.com/articles/san-349802-clemente-pet.html

[27] Oceanside and San Clemente determined that no pet store bans were appropriate as pet stores are not a problem.  As San Clemente Councilman Bob Baker stated: "Perfectly acceptable dogs come from pet stores."  Councilman Jim Evert is quoted as saying: "How can we establish things to force people to go to the pet shelter? . . . It just doesn't seem American to me.  A puppy mill is a breeder that puts out a lot of puppies.  It could be any breeder."  http://www.ocregister.com/articles/san-349802-clemente-pet.html.   In New Mexico, "rescues" are even setting up "boutique" stores to provide a retail environment for people to purchase dogs.  *See, e.g.,* NBCNews.com, Article by Rebeca Dube ("No pups for sale? Cities ban pet shops") dateline 5/27/10.



1  when coupled with the Working Group that is so closely intertwined with

2  the City Council and the Ordinance, is that the City, by and through its

3  council members has a significant animus toward San Diego Puppy, and is

4  doing the bidding of the retail shelter or retail rescue organizations.

5      93.    In addition to shutting down his store, the filing of any action by

6  the City will further damage Mr. Salinas' reputation, impact his ability to

7  obtain puppies for sale, force the relinquishment of the San Diego store,

8  force layoffs of twelve employees, and cause David Salinas and his wife

9  additional damages and emotional distress according to proof at trial.   As it

10  is, in order to avoid unwarranted prosecution, San Diego Puppy has stopped

11  selling dogs in San Diego.  This drastic step is causing significant damages to

12  Plaintiffs and Plaintiffs' employees.

### Parties

14      94.    Plaintiff David Salinas is a small businessman, and a resident of

15  the City of San Diego, California.  Salinas is the director and Chief Executive

16  Officer for the San Diego Puppy, Inc., Oceanside Puppy and National City

17  Puppy.

18      95.    Plaintiff Veronica Salinas is David Salinas' wife, and is a resident

19  of the City of San Diego, California.

20      96.    San Diego Puppy is a California corporation in good standing,

21  with its principal place of business at 5827 Mission Gorge Road, San Diego,

22  California 92120.  San Diego Puppy was first incorporated on November 11,

23  2011, and has operated in as a pet-related business, including pet sales,

24  continuously until the passage of this Ordinance forced San Diego Puppy to

25  remove the puppies from its store causing a loss of revenue.  San Diego

26  Puppy is, and at all times relevant was, the only pet store in the City of San

27  Diego selling purebred puppies eligible for registration with AKC and other



1  canine registries.  Mr. Salinas has purchased purebred and designer hybrid

2  puppies from a legal distributor handling puppies from licensed and

3  regulated breeders across the county.  The distributor, Hunte Kennel

4  Systems and Animal Care, Inc., is a Missouri corporation in good standing.

5  But for this Ordinance and the threatened enforcement, Plaintiffs intend to

6  continue to purchase puppies from the distributor, and to obtain healthy,

7  inspected and regulated purebred puppies for sale at San Diego Puppy.

8      97.    Defendant City of San Diego is a municipal corporation

9  operating under a Charter in Southern California.  It covers 342.4 square

10  miles with a diverse population of exceeding 1,316,837 people.   San Diego

11  hosts more than 32 million visitors each year, and these visitors spend

12  nearly $8 billion annually in the local economy.  The existing City Charter

13  was established in 1931 and currently calls for governance by nine city

14  councilmembers and a mayor.  It permits the City to "exercise any and all

15  rights, powers, and privileges heretofore or hereafter granted or prescribed

16  by the General Laws of the State."  *See* City Charter, Article I, Section 2.

17  Defendant City of San Diego ("City") and has an interest in, among other

18  things, ensuring open, transparent, and accountable government decision-

19  making, and protecting the region's environment and economy.  At the time

20  that the Ordinance was passed, the Mayor of San Diego was Bob Filner, and

21  he signed the Ordinance on behalf of the City of San Diego shortly before

22  stepping down as mayor.

23      98.    Animal Protection and Rescue League ("APRL") is a California

24  corporation that purports to be a 501(c)(3) tax exempt charity,[28] with a

25

26  _____

[28] It appears that APRL was formerly a New York corporation that filed with the State of
27  California in 2004, with Bryan W. Pease as the agent for service of process.  The entity
appears to have been operating out of a thrift store on Clairemont Mesa Road in San
28  Diego.  Although the store still bears the name of the corporation, the California
Secretary of State records indicate that the corporation has been surrendered.



stated mission of "exposing and eliminating animal cruelty". According to GuideStar, APRL is one of 23,008 alleged charities using the "animal protection, welfare and services" description. GuideStar notes that the organization frequently works behind the scenes and is not inclusive. According to the Form 990 filed by APRL, the organization took in $1,280,173 in contributions between 2007 through 2011. That same form asserts that the corporation did not engage in any lobbying activities or have a 501(h) on file for 2012.

99. On information and belief, APRL has, in fact, engaged in influencing political and legislative outcomes. The description of its activities confirms that the organization engages in significant activities to influence both public opinion and the City. For example, the corporation states that it "Recruited participants and held events during San Diego Veg Week, which the San Diego County Board of Supervisors supported with a resolution. . . ." Moreover, according to APRL's websites, the corporation asserts that:

> Since forming in 2003, APRL has garnered the attention of national and international media, **influenced animal protection legislation**, conducted numerous rescues of abused factory farmed animals, **influenced cities to adopt humane solutions to wildlife management**, and created a network of grassroots outreach volunteers. (emphasis added).

100. Bryan Pease is a California attorney. Defendant Pease formed APRL in approximately 2003, and currently serves as director and chairman for the corporation. Pease asserted during the San Diego City Council meeting that *he* is the drafter of the Ordinance. Further, Councilwoman Emerald stated that Pease and Emerald "go back" many years and she has "worked with him" for a long time.



101.   The San Diego Animal Defense Team is a California business entity of unknown form.  It was a part of the Working Committee along with Emerald and Zapf, San Diego City Council members, and states:

> The San Diego Animal Defense Team has been on the formal working committee for this ordinance for months. We started alone, creating a printed and bound information packet with puppy mill and pet store facts and the San Diego connection. **We provided a packet to each City Council member in September 2012** and gave them our petition asking for the ordinance, with 40 pages of signatures. **We met with staffs of several Council members.**
>
> We eventually joined with the San Diego Humane Society and APRL to work together toward our common goal. As part of that working committee, the Animal Defense Team has gathered endorsements for a ban from more than 75 animal related businesses and animal welfare groups.[29] (emphasis added).

Plaintiffs reserve the right to amend the form of this entity once the true form is discovered.

102.   Defendant Companion Animal Protection Society ("CAPS"), is a Delaware corporation conducting political and other activities in San Diego, California.

103.   San Diego Humane Society and S.P.C.A. ("SDHumane") is a California corporation and was a part of the working group that was instrumental in promulgating the Ordinance.   Further, upon information and belief, SDHumane acts as an enforcement arm with regard to animal control issues in San Diego County.

104.   Collectively, APRL, Pease, ADT, CAPS and fictitious defendants 1 – 100, inclusive, may be referred to as "Activist Defendants" as the context may dictate.

---

[29] http://www.sdanimaldefenseteam.blogspot.com/ (visited 10/8/13).


SCHLESINGER CONRAD LAW FIRM

## Jurisdiction and Venue

105.   The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1367(a), and 2201. The Court can assert personal jurisdiction over Defendants because they are located in this judicial District. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(l) and (2) because Defendants reside in this District and a substantial part of the relevant events underlying this action occurred in this District.

106.   This Court supplemental jurisdiction over the state law claims pursuant to 28 U.S. C. § 1367.  As will be demonstrated, the claims all arise out of illegal and unwarranted, deliberate targeting of San Diego Puppy for elimination.

107.   Plaintiffs are submitting a claim with the City of San Diego based upon the City's violation of, *inter alia,* Equal Protection, 42 U.S.C. §§ 1983 and 1985, and Business and Professions Code § 17200.   Plaintiffs specifically reserve the right to amend and/or supplement this Complaint to include such causes of action in the event that the City denies or fails to act upon such claim.

## FIRST CAUSE OF ACTION

(Declaratory Relief – Violation of Equal Protection)

(Against the City of San Diego and DOES)

108.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 107 and each allegation asserted therein as though fully set forth here.

109.   Plaintiffs seek a judgment from this Court that the Ordinance, generally and/or as applied is unconstitutional and unenforceable against Plaintiffs including San Diego Puppy.

110.   San Diego Puppy and the retail shelter or retail rescue organizations are similarly situated with respect to the alleged goal of



limiting the market for substandard breeders from out-of-state, encouraging long-term and loving homes for animals, and ensuring the humane treatment of animals.  Both transfer the ownership of dogs to members of the general public.  Unlike the retail shelter or retail rescue organizations, however, San Diego Puppy: (1) does not buy from substandard breeders; (2) uses only humane methods of housing and care of all dogs in its custody and control; (3) provides appropriate veterinarian care for all dogs in its custody and control; (4) has only microchipped dogs to ensure that they can be identified and returned to their owners; (5) assists in rehoming should an owner decline to keep the dog for any reason; and (6) provides strong guarantees that each dog is healthy and free from hereditary and other diseases.

111.    Plaintiffs are a vilified group in that any "pet store" or its owner is the subject of vehemently disparaging comments, censure, animus and threats.  Plaintiffs have suffered invidiously discriminatory animus at the hands of the public, the Activists and, now, by the City.

112.    In the alternative, San Diego Puppy is a "class of one" in that the City, by and through the councilmembers and the Ordinance, has acted to deprive Plaintiffs of their unique but cognizable constitutional rights.  These actions were intentional, against a similarly situated party, and there was no rational basis for the difference in treatment or the distinction because, *inter alia,* both the retail shelter or retail rescue organizations and San Diego Puppy transfer title to dogs to third parties, and the only real distinction turns on the form of the entity and the medical soundness and social history of the dogs. . .

113.    There is no goal set forth by the Ordinance, or the Accepted Ordinance, that reflects a legitimate state interest that is furthered by prohibiting the transfer of dog ownership only by retail pet stores, while



1     allowing alleged shelter or rescue organizations to continue to transfer

2     ownership of dogs with questionable or unknown social histories, unknown

3     dams and sires, unknowable health histories, and questionable breeding.[30]

4     This is particularly true since a member of the general public acquiring

5     ownership of a dog from a retail shelter or retail rescue organization that

6     finds a problem with the animal and declines to keep it will necessarily have

7     no option other than returning that animal to a shelter.  Further, there is no

8     rationale for allowing the dubious "partner organizations" that are not

9     admitted as California corporations and/or not legal tax-exempt

10    corporations to continue to transfer ownership of dogs, while denying such

11    right to San Diego Puppy.  Likewise, it is both unclear and of no benefit to

12    allow the transfer of title to an animal by a "humane society" where such a

13    term is undefined, and the activities of such an organization are "in whole or

14    significant part" the rescue of dogs, but the terms "significant part" and

15    "rescue" also are undefined.

16          114.  The care and handling of dogs from licensed and regulated

17    breeders is under the oversight of the United States Department of

18    Agriculture ("USDA") and Animal and Plant Health Inspection Service

19    ("APHIS").  These agencies determine if a breeder is substandard; it is not

20    for the City of San Diego to create classifications between profit and non-

21    profit corporations in an attempt to circumvent the determinations of the

22    USDA and APHIS.

23

24

_____

[30] Carlsbad Mayor Matt Hall, who voted against a similar ban that was briefly enacted in Carlsbad, California, stated that the campaign by animal rights groups is off target. He said they should instead lobby for greater scrutiny of breeders.  "I don't think this ordinance touches the problem," he said. "It's your federal government that is shortchanging you."  http://www.utsandiego.com/news/2013/Oct/08/council-bans-retail-pet-sales-at-carlsbad-stores/ (visited 11/6/2013).   The City of Carlsbad has since repealed its ordinance after investigating the assertions by the Activists and finding them to be exaggerated and misguided.



115.   The Ordinance and Accepted Ordinance are not rationally --
much less substantially -- related to any legitimate goal because the right to
transfer ownership of dogs turns on whether the entity is a non-profit or for-
profit.  As to non-profits, the Ordinance does not inquire into the origin of
the animals to be transferred.  That query is limited to for-profit enterprises.
Both enterprises transfer animal ownership, *i.e.,* sell dogs.  By prohibiting
the transfer of ownership of dogs by pet stores while permitting the transfer
of such ownership only by or in conjunction with non-profit organizations,
the Ordinance treats two similarly situated groups differently in violation of
the Equal Protection clause of the 14th Amendment of the United States
Constitution.  The Ordinance wrongfully penalizes a legitimate and
otherwise legal business without a rational basis for doing so.

116.   The stated rationales for the Ordinance are not supported by
facts, and no independent study confirms the validity of the assertions made
by the activists that were involved in the working group.

117.   The assertions that conclude public policy is furthered by
banning the transfer of dog ownership except by retail shelter or retail
rescue organizations is, upon information and belief, a sham to create a
monopoly on dog sales in the retail shelter or retail rescue organizations and
control the market.

118.   The advocacy of the Ordinance by alleged shelter and rescue
organizations was a sham to further the goal of increased sales at a profit by
the retail shelter or retail rescue organizations, and create a monopoly on
dog sales.  Many of the activist groups obtain dogs for little or nothing and
sell those same dogs from $175, $250 or even as much as $500.  *See* Exhibit
4(b), *supra*.

/ / /

/ / /



119.   The retail shelter or retail rescue organizations and their affiliates, including HSUS and other third parties and/or fictitiously named defendants, stand to make more money if they can eliminate the competition from pet stores and limit the options of the general public in acquiring a pet.

120.   As there is no legitimate, rational or substantial basis for the Ordinance, and true animus exists on the part of the city councilmembers against Plaintiffs, the Ordinance cannot stand.

121.   Accordingly, Plaintiffs seek a judgment pursuant to 28 U.S.C. §§ 2201, *et seq.,* that declares the Ordinance to be unlawful and void; and further seek a temporary restraining order and/or temporary injunction to enjoin the City from enforcing, or threatening to enforce the Ordinance pending this Court's ruling on the merits; attorney's fees and cost of suit, and such further equitable and other relief as the Court deems to be just and proper.

## SECOND CAUSE OF ACTION

(Declaratory Relief - Violation of Due Process Clause in Art. I,§ 7 of the California Constitution)

(Against the City of San Diego and DOES)

122.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 121 and each allegation asserted therein as though fully set forth here.

123.   The Due Process Clause of the California Constitution provides in pertinent part that "[a] person may not be deprived of life, liberty, or property without due process of law . . . . " See CAL. CONST., ART. I,§ 7.

124.   Under this clause, an ordinance is void for vagueness if, among other things, it fails either of these two tests: (a) it fails to give a person of ordinary intelligence a reasonable opportunity to know what the ordinance prohibits, or (b) it impermissibly delegates basic policy matters to



1  policemen, judges, and juries for resolution on an *ad hoc* and subjective

2  basis, with the attendant dangers of arbitrary and discriminatory

3  application. The Ordinance cannot pass either test.

4      125.   The Ordinance fails the first test because it does not reasonably

5  inform individuals or businesses whether it prohibits the sale, *etc.,* of dogs

6  that come from a non-California retail shelter or retail rescue organization.

7  Moreover, the Ordinance does not inform a reasonable person of whether it

8  is acceptable to sell a dog from an Oklahoma non-profit corporation

9  admitted to California, where such corporation engages in "rescue" in

10  "significant part" of animals.

11      126.   The Ordinance purports to ban the "display" of any live dog,

12  regardless of whether the display is for sale, by any "*commercial*

13  *establishment*".  "Commercial establishment" is defined to include any sole

14  proprietor selling for profit.  Thus, under the relevant definitions, the

15  Ordinance purports to ban an individual breeder from "displaying" any dog,

16  even at their own home, much less selling one from their own home.  This is

17  contrary to the new USDA/APHIS ruling that requires a face-to-face

18  transfer of dogs by any breeder with more than four intact bitches.  A true

19  and correct copy of the relevant pages from the USDA/APHIS ruling is

20  attached hereto as Exhibit 11, and is incorporated by reference.  Thus, the

21  Ordinance is vague, overly-inclusive and violates the First Amendment of

22  the United States Constitution guaranteed right of free speech, including

23  commercial speech.  It is also pre-empted by the USDA/APHIS ruling that

24  clearly seeks to occupy the field.

25      127.   The Ordinance does not define the terms "rescue" or "significant

26  part", so reasonably it would be legal to sell dogs that were "sourced" from

27  an Oklahoma non-profit corporation, even if that corporation paid hundreds

28  of thousands of dollars to its directors and had tens of thousands of

deductions for advertising, thereby retaining its "non-profit" status in Oklahoma, and continued to be admitted in California as a foreign corporation.  If an Oklahoma non-profit purchased from a Missouri "puppy mill" (deeming them to be "rescued" from the puppy mill) and then resold them in San Diego, this would apparently be legal under the Ordinance.  It would, apparently, still be legal if the non-profit did this only once a year, but in its assessment considered this to be a "significant part" of its operations.  Because the law is overly vague, it can lead to absurd results.

128.   The Ordinance also does not reasonably inform a person as to whether its prohibition on offering "for sale, deliver, barter, auction, give away, transfer, or sell any live dog, cat, or rabbit in any pet shop, retail business, or other commercial establishment located in the City of San Diego" applies to a transaction that is consummated online and shipped to a place outside of San Diego or in which the purchaser is located outside of the City.

129.   These vague aspects of the Ordinance necessarily leave it to the persons who enforce the Ordinance, and persons who decide whether the Ordinance has been violated (such as jury members) to determine these vagaries of the Ordinance on an *ad hoc* and subjective basis; as a result, the Ordinance also fails the second test for vagueness.

130.   The Ordinance also fails because there is no indication of who is to enforce these vague terms, or what recourse any individual would have to dispute arbitrary or discriminatory enforcement.

131.   Accordingly, Plaintiffs seek a judgment pursuant to 28 U.S.C. §§ 2201, *et seq.,* that declares the Ordinance to be unlawful and void; and further seek a temporary restraining order and/or temporary injunction to enjoin the City from enforcing, or threatening to enforce the Ordinance pending this Court's ruling on the merits; attorney's fees and cost of suit,



1   and such other and further equitable and other relief as the Court deems to

2   be just and proper.

### THIRD CAUSE OF ACTION

(Declaratory Relief – Violation of Commerce Clause)

(Against the City of San Diego)

6   132.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through

7   131 and each allegation asserted therein as though fully set forth here.

8   133.   San Diego Puppy engaged in interstate commerce in that it

9   purchased puppies from breeders across the United States.  The puppies

10   were shipped to San Diego Puppy in climate-controlled, safe, regulated and

11   licensed trucks operated by licensed brokers from Missouri and other

12   locations in the country.

13   134.   The Ordinance purports to restrict the sale of dogs in California

14   to those dogs that are sourced from California corporations or those

15   associated with a humane society (as opposed to for-profit) in violation of

16   the Commerce clause.  The Ordinance protects and exempts the Activist

17   Defendants and non-profit corporations that "in significant part" are

18   engaged in "rescue."

19   135.   The Ordinance treats for-profit and non-profit corporations in

20   the stream of commerce throughout the United States differently in

21   violation of the commerce clause.

22   136.   Under the Ordinance, the sole sources of animals that Plaintiff

23   can obtain for sale may not be those from any reputable breeder, or any

24   breeder, trader or owner or wholesaler.  This is true whether Plaintiff opted

25   to trade, barter or sell the animal.

26   137.   The Ordinance is clearly and unequivocally disparate and

27   arbitrary in nature, while also regulating the Plaintiff's power and ability to

28   purchase and sell animals other than those from locations dominated and



1  determined by Defendants and comparable third-parties and/or fictitious
2  defendants.

3     138.  Plaintiffs contend that the Ordinance discriminates against
4  interstate and foreign commerce by impeding the free flow of non-California
5  animals into San Diego, and prohibiting the importation and sale of dogs to
6  San Diego visitors from other states and other countries.

7     139.  Further, the Ordinance prohibits the sale of dogs in California
8  pet stores of dogs from out-of-state for-profit corporations, but could be
9  interpreted to permit the sale of dogs from out-of-state non-profits.

10    140.  The Commerce Clause empowers Congress "to regulate
11 commerce with foreign nations, and among the several states." U.S. CONST.
12 art. I, § 8, cl. 3. While the Commerce Clause affirmatively grants Congress
13 the power to regulate interstate and foreign commerce, it also implicitly
14 restrains the ability of the several states to discriminate against or impose
15 substantial burdens upon interstate commerce.

16    141.  The Ordinance imposes a substantial burden on interstate
17 commerce by impeding the importation of any dogs for sale in San Diego
18 from for-profit breeders in other states, much less other countries.  The
19 Activists and third-parties are, in fact, promoting this very model in a city-
20 by-city agenda throughout California.  They boast that San Diego is the 33[nd]
21 city to ban pet stores.  Such cities as South Lake Tahoe, Glendale, Irvine,
22 West Hollywood, Dana Point, Chula Vista, Laguna Beach, Huntington
23 Beach, Los Angeles, Burbank, and Hermosa Beach, California all currently
24 have bans similar to the one at issue here.  A series of additional bans would
25 prohibit all importation of dogs from out-of-state for-profit breeders and
26 clearly impose substantial burdens on interstate commerce. The number of
27 anti-pet store bans already creates an unreasonable burden on interstate
28 commerce.

142.   To the degree that out-of-state for-profit breeders are a problem —a proposition that Plaintiffs do not endorse—then it is beyond the authority of the local government or even the state government to try to insulate itself from the problem by instituting an Ordinance that creates a barrier to the free flow of interstate trade from for-profit breeders.   The Ordinance effectively deprives out-of-state puppy producers the right to sell to San Diego, California markets.  It simultaneously deprives San Diego Puppy of purchasing from out-of-state producers.

143.   The Ordinance is discriminatory on its face as preferring California non-profits and San Diego "rescue partners."

144.   The City, by and through the Ordinance and its preference for California non-profits or City-approved partners, is improperly acting as a market regulator, in excess of its authority granted under its Charter and is contrary to general laws. The non-profit character of an enterprise does not place it beyond the purview of federal laws regulating commerce, and no state or local ordinance may distinguish between non-profit and for-profit enterprises.  Yet, that is exactly what this Ordinance does by allowing non-profits to sell any dog without regard to its source, while burdening a for-profit business by prohibiting the purchase of dogs from interstate brokers or producers for sale in San Diego.  The Ordinance, therefore, violates the dormant commerce clause. It is without any legal weight or authority.

145.   Accordingly, Plaintiffs seek a judgment pursuant to 28 U.S.C. §§ 2201, *et seq.,* that declares the Ordinance to be unlawful and void; and further seek a temporary restraining order and/or temporary injunction to enjoin the City from enforcing, or threatening to enforce the Ordinance pending this Court's ruling on the merits; attorney's fees and cost of suit,

/ / /

/ / /



1  and such other and further equitable and other relief as the Court deems to
2  be just and proper.

3  **FOURTH CAUSE OF ACTION**

4  (Violation of Business and Professions Code § 16700, *et seq.*)

5  (Against Activist Defendants: Animal Protection and Rescue League, Bryan

6  Pease, San Diego Humane Society and SPCA; San Diego Animal Defense

7  Team and Fictitiously Named Defendants)

8  146.  Plaintiffs re-allege and hereby incorporate Paragraphs 1 through
9  145 and each allegation asserted therein as though fully set forth here.

10  147.  Plaintiffs allege that the Activist Defendants and fictitiously
11  named defendants, and each of them, have entered into an agreement that
12  has as its purpose the elimination of the supply of puppies to California,
13  generally, and specifically to Plaintiff San Diego Puppy.

14  148.  This agreement is in violation of, *inter alia,* Business and
15  Professions Code § 16720(b) and (e)(4), in that its intent is to limit and
16  eliminate the availability of commercially bred puppies and prohibit the sale
17  of such puppies.

18  149.  Upon information and belief, a central purpose in this
19  combination and agreement is to eliminate competition from pet stores.

20  150.  Plaintiffs were contacted by SDHumane and/or fictitious
21  defendants who offered that Plaintiff could remain in business if Plaintiffs
22  agreed to adopt the business model that placed the retail shelter or retail
23  rescue organizations including fictitiously named defendants at the center of
24  the supply chain.  The Ordinance was designed to put Plaintiffs out of
25  business if they did not adopt the model promoted by Defendants.

26  151.  The conduct by the Activist Defendants and fictitiously named
27  defendants has, in fact, eliminated competition in violation of Business and
28  / / /



Professions Code § 16720, in that it has eliminated the San Diego market for San Diego Puppy's puppies.

152.   Further, by their participation in drafting and furthering the Ordinance, the Activist Defendants discriminated in favor of California non-profits, humane societies and rescues.  The Activist Defendants are closely aligned with and, upon information and belief, have working agreements with these fictitiously named defendant organizations to further the goals of eliminating production and competition.

153.   Defendants, and each of them, had a conscious commitment to a common scheme, with the stated purpose to eliminate the availability of a legal commodity and shutting down San Diego Puppy.

154.    As a direct and proximate result of the acts alleged, Plaintiffs have been damaged in an amount to be proven at trial.  Further, and pursuant to Business and Professions Code § 16750, Plaintiffs are entitled to treble damages.

155.   In addition, Plaintiffs are entitled to costs of suit and attorney's fees.

**FIFTH CAUSE OF ACTION**

(Violation of 42 U.S.C. § 1983)

(Against Defendant the City of San Diego, and DOES 1-100)

156.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 155 and each allegation asserted therein as though fully set forth here.

157.   Title 42 U.S.C. Section 1983 provides a civil cause of action against any person acting under color of law who has wrongfully deprived the plaintiff of personal rights or liberties secured by the United States Constitution, the California Constitution or other valid law.

158.   City councilmembers Marti Emerald and Lori Zapf had a long-standing animus against pet stores that sell puppies.  This is evidenced by,



*inter alia,* these councilmembers' comments prior to the hearing in March and again in July. *See, e.g.,* ¶¶ 17 and 36, *supra.* It is further demonstrated by the failure to seek or accept any input from stakeholders, groups or individuals with information that contradicts and/or discredits the Activists' erroneous and sham assertions, *e.g.,* that pet stores sell puppies from substandard breeders and that the ongoing sale of puppies at pet stores leads to overcrowding of shelters and increased euthanasia of pets.

159.   Plaintiff has a fundamental right to engage in an occupation commonly held within communities. Such right has been said to be "the very essence of the personal freedom and opportunity that is was the purpose of the Fourteenth Amendment to secure." *Truax v. Raich*, 239 U.S. 33 (U.S. 1915) (questioned and criticized on other grounds). This right is also guaranteed under the California Constitution, Article I, Section 1, which states:

> All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty; acquiring, possessing, and protecting property; and pursuing and obtaining happiness.

160.   City and Councilmembers Emerald and Zapf conspired with Defendant Activists and fictitiously named defendants to promote and draft the Ordinance with calculated indifference to Plaintiff's rights. Specifically, but without limitation, Plaintiff alleges that through the actions of Councilmembers, working in concert with the Activists, the City Council adopted a deliberate policy to close Plaintiffs' business and thereby deprive Plaintiffs of their business interests and personal occupational liberty.

161.   The actions of Emerald and Zapf, acting under color of law and as City Councilmembers, in concert with Activist Defendants, resulted in the destruction of Salinas' business and his right of occupational liberty. This was based upon Emerald and Zapf's personal bias and animus toward the



sale of pets in a commercial setting, and the intentional incorporation of this bias in the Ordinance, an ordinance that specifically targets San Diego Puppy as the only City pet store then in existence, and favors Activist Defendants' interests.[31]  This animus was directed at San Diego Puppy despite the fact that that the so-called shelters and rescues also transfer title of pets, *i.e.* sell pets, and upon information and belief make money from such sales.

162.   Plaintiffs have and will continue to suffer irreparable harm as a result of the deprivation of Salinas' personal liberties.  Specifically, but without limitation, Salinas has been deprived of his right to practice his profession, he has suffered emotional distress, loss of reputation, loss of business, and loss of esteem.  Plaintiffs reserve the right to include a claim for monetary damages should the City deny the pending claim by Plaintiffs against the City for monetary damages.  In that event, the value of such damages shall be proven at trial, but are alleged to be not less than the jurisdictional minimums of this Court.

163.   Based upon the comments and actions of Emerald and Zapf in pushing through the Ordinance without any real input from stakeholders such as Plaintiffs, and the back-room meetings with only Activist Defendants, the lack of substantial, rational or even legitimate basis for the Ordinance, the failure of the Defendants to do any independent research into the Activists' claims, along with the very real harm and deprivation

/ / /

---

[31] One example is seen by comparing California Senate Bill 917's language with the Ordinance.  While SB 917 defines "rescue" as an organization whose "primary purpose" is rehoming dogs, *etc.,* San Diego's Ordinance seeks to protect the Activist Defendants who cannot lay claim to meeting this definition of "rescue."  Accordingly, the Ordinance substitutes SB 917's definition with the broader and vague phrase that a "rescue" is one that places dogs as a "substantial part" of its organization.  Under this vague and undefined term, even an organization whose primary purpose is lobbying can claim to be a "rescue."



1    caused by the Ordinance, Plaintiffs have a high likelihood of prevailing on

2    this cause of action, and of prevailing on the constitutional and other claims.

3        164.   Accordingly, Plaintiffs seek a judgment pursuant to 28 U.S.C. §§

4    2201, *et seq.,* that declares the Ordinance to be unlawful and void.  Plaintiffs

5    also seek a judgment pursuant to 28 U.S.C. §§ 2201, *et seq.*, and 42 U.S.C. §

6    1983 that declares that the City by its enactment and threatened

7    enforcement of the Ordinance has deprived Plaintiff of its rights secured by,

8    *inter alia,* Equal Protection and the Due Process Clause of the Fourteenth

9    Amendment to the United States Constitution.  Plaintiffs further seek a

10   temporary restraining order and/or temporary injunction prohibiting the

11   enforcement of the Ordinance pending this Court's ruling on the merits.

12   Plaintiffs also pray for damages the City and for damages including punitive

13   damages against Activist Defendants, and each of them, and such other and

14   further relief as the Court deems to be just and proper,  including judgment

15   for costs of suit and attorney's fees pursuant to 42 U.S.C. § 1988 on this

16   claim for relief.

17       165.   Further, pursuant to 42 U.S.C. § 1983, and 28 U.S.C. § 2201, *et*

18   *seq.,* Plaintiffs reserve the right to seek an injunction should the City

19   attempt to enforce the Ordinance following judgment of this Court, and ask

20   that this Court retain jurisdiction for such purpose.

21   **SIXTH CAUSE OF ACTION**

22   (Violation of 42 U.S.C. § 1985)

23   (Against all Defendants)

24       166.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through

25   165 and each allegation asserted therein as though fully set forth here.

26       167.   Marti Emerald and Lori Zapf were, and are, councilmembers for

27   the City of San Diego.  They were, therefore, public employees acting in their

28   official capacity and/or exercising their responsibilities pursuant to law at



the time they met with the Working Group of Defendant Activists and contrived to push through the Ordinance.

168.   Upon information and belief, Emerald and Zapf, orally and/or by implication, conspired with the Activist Defendants and fictitiously named defendants in drafting and promoting the Ordinance.

169.   The Activist Defendants, and each of them, approached *inter alia,* Zapf and Emerald and obtained their approval to draft and promote the Ordinance, traditionally state or municipal functions.  Accordingly, the Activist Defendants, including but not limited to ADPL, Pease and CAPS, acted in a manner that would be fairly attributable to the State in that they exercised power in formulating the Ordinance.

170.   Title 42 of the United States Code Section 1985 prohibits any two or more persons in any State from conspiring to deprive any person the equal protection of the laws, or to injure any citizen in person or property on account of such support or advocacy.

171.   Upon information and belief, there are more than 11,500 pet stores that sell pets in the United States.

172.   In recent years, the Humane Society and others have targeted and vilified such pet store owners and all breeders supplying pets to them. Through this campaign, in concert with city councils members and activists, Pet Store Owners are depicted as amoral profiteers, willing to torture animals without regard to humane standards of any sort.  Breeders and owners are now typically hesitant to state their residences or their occupations publically for fear of being attacked and harassed.

173.   In addition to being targeted by the City as the only pet store owner left in town, Salinas was the target of a threatening and harassing phone call just before this Complaint is being filed.  This call was from a

"wireless" caller and stated, *inter alia,* "don't worry we'll get you I will give you a one way ticket" and accused Salinas of eating Chihuahuas.

174.   Salinas also got a call from someone identifying herself as Christine Cabanaro on October 10, 2013.  Ms. Cabanaro made racist slurs, asserted that Salinas was "an illegal" (he is a U.S. citizen) and that she did not care if he ate his own children but when it came to dogs, it was her business.   She stated specifically that Salinas was going to "get shut down."

175.   For example, one visitor to San Diego Animal Defense Team, Shawna Sanders, recently posted a message regarding David Salinas that stated: "He's such a loser!!!!! May he get testicular cancer soon!!!!!"[32]

176.   Animal Defense Team also posted the complaint form on their Facebook site and encouraged everyone to download it and file a complaint against David Salinas and San Diego Puppy.

177.   Other calls included explicit threats such as "You know I would like to slit your throat and let the blood run all over" and "I bet if I open your stomach and find out you have been eating those puppies, I know you don't seem to care about that you piece of crack head mother but don't worry about it, we will get you".   These calls were reported to the FBI who stated there was nothing they could do as the caller used a throw-away phone.

178.   Based upon the animus shown by the public and by members of the City Council, including comments by the City Council that San Diego Puppy – as the only pet store in existence -- was a "problem", Plaintiffs are members of a class subjected to invidiously discriminatory animus.

179.   The City, by and through Emerald and Zapf, worked in concert with Activists Defendants in creating the Ordinance.  Additionally, upon information and belief, Emerald and Zapf encouraged the animus against

---

[32] https://www.facebook.com/pages/San-Diego-Animal-Defense-Team/191702047564450?ref=br_tf (visited on 10/16/2013).



1  Plaintiffs by creating the working group comprised solely of animal activist

2  organizations.

3       180.   The right to engage in a lawful enterprise, and to pursue one's

4  chosen profession, is a right guaranteed to citizens pursuant to the United

5  States Constitution (14th Amendment) and the California State Constitution

6  (Art. I, Sec. 1).  Salinas has a right to occupational liberty as his chosen

7  profession is a lawful retail store engaged in selling animals that are under

8  the jurisdiction of Untied States Department of Agriculture ("USDA").

9       181.   The conspiracy had as its central purpose the deprivation of

10  Plaintiffs' protected rights in that it was aimed at forcing the closure of

11  Plaintiff's business and depriving him of his occupational liberty and equal

12  protection of law contrary to most other cities and states in the country.

13       182.   As a result of the concerted action between the Emerald and

14  Zapf, acting under color of law as councilmembers for the City, and in

15  concert with the Activist Defendants, David Salinas and his wife, as well as

16  his store, have suffered financially and emotionally because he is unable to

17  conduct his profession in the City, and because he has been picketed,

18  harassed and had his individual privacy invaded including through racial

19  and other slurs.

20       183.   The conspiracy between the activists and the City is a violation of

21  42 U.S.C. § 1985, and Plaintiff prays relief in the form of a temporary

22  injunction and/or temporary restraining order against enforcement of the

23  Ordinance, pending trial on the merits; a declaratory judgment finding that

24  the City and Activists have conspired to violate 42 U.S.C. § 1985(c);

25  damages, costs of suit and attorney's fees, and such further and other

26  equitable or other relief as this Court may deem just and proper.

27  / / /

28  / / /



**SEVENTH CAUSE OF ACTION**

(Temporary Injunction and/or Temporary Restraining Order/Permanent Injunction)

(Against City of San Diego and DOES)

184.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 183 and each allegation asserted therein as though fully set forth here.

185.   The Ordinance is an unconstitutional attempt to: (a) regulate the market of dogs; (b) provide a monopoly to non-profits in preference over for-profit corporations; (c) force the pre-existing bias of councilmembers on Plaintiffs; (d)  deprive Plaintiffs of their constitutionally protected occupational liberties; (e) deprive Plaintiffs of their constitutionally guaranteed equal protection under the law; (f) represents a violation of 42 U.S.C. § 1983; and (g) is the result of a wrongful conspiracy between council members and Activists to the detriment of Plaintiffs all in violation of the United States and California Constitutions.

186.   Under the Ordinance, San Diego Puppy and individual Plaintiffs will suffer irreparable harm in that:

        a)     Plaintiffs will be forced to close their business;

        b)     Plaintiffs will be forced to either pay on a lease it cannot support or, in the alternative, breach the current lease and be exposed to damages;

        c)     Plaintiffs will be forced to terminate employment of 12 key employees;

        d)     Plaintiffs will suffer loss to reputation and buying power;

        e)     San Diego Puppy will be destroyed, the lease lost and the loyalty of customers – many of whom are repeat customers – will be destroyed, including loss of good will associated with the business;

        f)     Plaintiffs will suffer loss of the individual right to pursue a legitimate profession; and



g)     Plaintiffs will be diminished in their personal and public status as a legitimate business owner, including but not limited to a diminution of credit rating for both Salinas individually and for San Diego Puppy;

187.   Conversely, the City will not be harmed by an injunction prohibiting the enforcement of the Ordinance during the pending litigation because:

a)  The practice of selling dogs in pet stores has been going on for decades;

b) The Assistant City Attorney noted that there are no health and safety issues raised by the sale of puppies at San Diego Puppy;

c) A sister store as close as Oceanside, California is legal and operating;

d) All puppies sold by San Diego Puppy are health checked, vaccinated, microchipped and appropriately housed and handled;

e) The City permitted this store from 2011 until September 4, 2013; and

f) Should any violation be found, the City has alternative means of ensuring the safety of dogs and consumers.

188.   Damages will not be a complete or satisfactory remedy, as Plaintiffs will lose reputation, buying power, and esteem in the general community in the time before trial on the matter can be had.

189.   Plaintiffs will likely prevail on the merits because the Ordinance pointedly differentiates between two-similarly situated groups, *i.e.,* transferors of dogs, and/or because Plaintiff as a class of one is being singled out for inequitable treatment under the law.

190.   The Ordinance improperly distinguishes between non-profit and for-profit for the transfer of title to dogs.

191.   The City inappropriately entrusted the research and drafting of the Ordinance to the Activists Defendants, the Activists Defendants and/or fictitious defendants were essentially acting as market regulators to their benefit and in pursuit of a monopoly.

192.   The Ordinance violates the commerce clause as set out above.

193.   The Ordinance constitutes a deprivation of due process and is the result of an improper conspiracy to target Plaintiffs by the Activists and the City, by and through their respective members, including Emerald and Zapf, and Activist Defendants.

194.   Accordingly, Plaintiffs pray relief from this Court such that this Court find that the Ordinance is unenforceable as violating the Equal Protection rights of Plaintiffs as an entity [and/or class of one plaintiff] engaged in the transfer of ownership of dogs and, thus similarly situated to those entities that are exempted under the Ordinance, as well as a violation of the (dormant) commerce clause; a temporary injunction and/or temporary restraining order prohibiting enforcement of the Ordinance pending the outcome of trial on the merits; a finding that the Ordinance does not serve a legitimate governmental interest related to Health and Safety, or any other legitimate goal of the City of San Diego; costs of suit herein plus attorney's fees, and such further and other relief as this Court may deem just and appropriate.

## EIGHTH CAUSE OF ACTION

### (Trespass)

(Against Activist Defendants: Animal Protection and Rescue League, Bryan Pease, San Diego Humane Society; San Diego Animal Defense Team)

195.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 194 and each allegation asserted therein as though fully set forth here. / / /



196.   Activist Defendants have engaged in consistent and unrelenting harassment at San Diego Puppy and Oceanside Puppy.

197.   Such conduct by Defendants includes but is not limited to:

- Gathering and shouting at customers both outside the stores and inside the stores;[33]

- Screaming at customers in the parking lot that Plaintiff is an animal abuser;

-  Blocking the doorways to the stores to prevent customers from entering;

- Following or attempting to follow customers inside the store to thrust literature at them and dissuade them from purchasing at San Diego Puppy and/or Oceanside Puppy;

- Obstructed the free flow of pedestrian and auto traffic in and through the store area.

198.   Plaintiffs allege that they have the exclusive right of control of the property by virtue of their lease, and they did not – and do not—authorize entry onto the premises.

199.   Plaintiffs have been harmed by this conduct including, but not limited to, diminution of business, loss of foot traffic, loss of good will, emotional distress and peaceful enjoyment.

200.   Accordingly, Plaintiffs seek damages in an amount to be determined at trial but not less than the jurisdictional minimums of this Court, *i.e.,* $75,000.

201.   Further, this was a campaign that was undertaken specifically to injure Plaintiffs and destroy their reputation and business.  The actions alleged herein were done by an evil hand guided by an evil mind such that

---

[33] An allegation that would be a violation of California Penal Code § 597, *et seq.*, but is not true.



Plaintiffs are entitled to punitive damages against all Activist Defendants and DOES who are identified through discovery as participating in or directing such a campaign of destruction.

202.   Plaintiffs further pray for attorney's fees and cost of suit and such further equitable and other relief as this Court may deem just and proper.

## NINTH CAUSE OF ACTION

(Injunctive Relief/Temporary Restraining Order/
Permanent Injunction Order)

(Against Animal Protection and Rescue League, Bryan Pease, San Diego Animal Defense Team, Companion Animal Protection Society, San Diego Humane and SPCA and all fictitiously named defendants)

203.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 202 and each allegation asserted therein as though fully set forth here.

204.   Despite efforts to move the Activist Defendants and as yet unidentified third parties away from the store entrance, including calling the police and filing complaints, upon information and belief, the Activist Defendants and third parties have continued to harass and disparage Plaintiffs.

205.   For example, upon information and belief Activist Defendants and third parties interfered with a ribbon cutting ceremony by inserting themselves in photos and even hitting an employee with a protest sign.   No action was taken by the police in that instance, and upon information and belief, the police asserted that the victim should take no action because "it was just a sign."

206.   Despite a warning that the location was private property, the Activists, including upon information and belief but not limited to, APRL and San Diego Animal Defense Team, held a "victory" party in the parking

1   lot where San Diego Puppy is located and advertised that party through

2   Facebook and, upon information and belief, on websites.

3       207.   At various times, including but not limited to, Activist

4   Defendants have blocked the doorway to San Diego Puppy during business

5   hours, and have hung their signs on the physical building to which Plaintiffs

6   have the sole legal right of occupation and use.

7       208.   San Diego Animal Defense Team stated recently on their

8   website:

9           HUMANE ALERT! Look who is trying to sneak in
            another puppy store. Yes, Mr. Oceanside and San
10          Diego Puppy himself! South Bay, are you ready to
            say NO to cruelty!
11
            These picts are at his new location that is currently
12          being renovated. We posted a message for his
            patrons to beware, that he was banned in the City of
13          San Diego! We also left some information to Adopt,
            don't Shop! I am sure he will get the message soon
14          enough that we are now watching him there too![34]

15      209.   The location at which San Diego Puppy is located is a small strip

16   mall that invites the public to attend as customers, only.  It does not

17   willingly open its property to third-parties for any purpose other than

18   shopping at the businesses located therein.

19      210.   The location has no areas dedicated to relaxation or dining, and

20   is not designed for public gatherings.  There is a small parking area for use

21   of customers only.

22      211.   Oceanside Puppy is, like San Diego Puppy, located in a small

23   strip mall, where the property is for customers of the stores, only.  It is not

24   designed nor commonly used as a public forum and is not open or intended

25   for such use.

26   / / /

27

28   [34] https://www.facebook.com/pages/San-Diego-Animal-Defense-
     Team/191702047564450



212.   While the National City store is located near an outdoor seating area, upon information and belief the area is not for the general public; but is for customers shopping in the small strip mall.  Moreover, the property where the store is located has large signs at each entrance that state "No Trespassing."

213.   The Activists are creating irreparable harm, a threatening and tense environment for Plaintiffs employees, causing emotional distress, interfering with business at San Diego Puppy, Oceanside Puppy, and National City Puppy, and such disruption is continuing even though Plaintiff has sought police intervention and filed police reports.

214.   The Plaintiff's business and personal reputation and character is being ruined and decimated and Plaintiff's customers are being harassed both inside and outside, as well as the Plaintiff's employees.  The fact that a protestor had the audacity to attack Plaintiff's employee during a public meeting at the Oceanside City Council hearing with police becoming involved and paramedic intervention makes the irreparable harm very apparent.

215.   Additional examples of the harmful nature of the Activist Defendants' conduct include, but are not limited to:

- The blocking of the entryway door or doors of the Plaintiff's business, both in San Diego and Oceanside;
- Posting notices on the doors of the National City store stating that customers should "open your eyes to their pain" – referring presumably to dogs in pet stores – and "Don't be fooled by their lies", referring to the pet store owners.
- Purposely and knowingly scaring children who are with their parents inside the store;



- Intentionally placing themselves between the main door to the store and shoving their literature up in the face of those approaching or exiting;
- Shouting profanities to the store's employees;
- Engaging in this derogatory and abusive behavior outside of the Plaintiff's place of worship;
- Following patrons into the Plaintiff's stores, and trying to even accost them inside by badgering them with their 'protest' literature;
- Shouting to the employees as they enter the building or exit the building before, during or after work, calling them derogatory names, and placing Plaintiff's employees under duress when they have not done anything but go to work;
- Engaging in assault and battery against Plaintiff San Diego Puppy's employee during a public hearing in Oceanside by grabbing the employee, scratching her and twisting her wrist.35, The victim employee was treated by medics following the attack;
- Continuing their harassment at the Oceanside Puppy store, even though such store is open legally, following the closure of San Diego Puppy by the instant Ordinance.

216.   As a direct and proximate cause of Defendants' conduct, Plaintiffs have been damaged and continue to be damaged.

217.   The conduct does not come within any First Amendment right, as it occurs in a non-public forum.

218.   Accordingly, Plaintiffs seek a judgment pursuant to 28 U.S.C. §§ 2201, *et seq.,* that declares the conduct by Activist Defendants to be unlawful; and further seek a temporary restraining order and/or temporary

---

35 Oceanside rejected the proposed ban.



injunction to enjoin the Activists from coming onto private property or within 1000 feet of David Salinas, his family or his businesses, or any of them, and/or any store employee pending this Court's ruling on the merits; a permanent injunction; attorney's fees and cost of suit, and such other and further relief as the Court deems to be just and proper.

## TENTH CAUSE OF ACTION

(Violation of Business and Professions Code § 17200, *et seq*.)

(Against all Activist Defendants and DOES 121 – 130)

219.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 218 and each allegation asserted therein as though fully set forth here.

220.   "Non-profit" retail shelter or retail rescue organizations in the City are not required to disclose the origin of their animals.  They are not subjected to inspections or regulation as are retail pet stores.

221.   The result is that the Activist Defendants are at liberty to make disparaging comments that are untrue, and gain an unfair advantage by convincing the public without any evidence that they alone provide dogs that do not come from "puppy mills".

222.   In fact, it is not true that retail shelter or retail rescue organizations do not resell dogs from puppy mills, as many do buy dogs at auctions specifically set up to transfer such dogs to third parties.[36]

223.   Further, the acts of Activist Defendants in conspiring with the pre-disposed councilmembers in misrepresenting and exaggerating the facts resulted in the Ordinance, thereby giving the Activist Defendants an unfair

---

[36] Additionally, because the origin of the dogs at shelters are – almost by definition – unknown, the retail shelter or retail rescue organizations cannot state that their dogs do not come from puppy mills originally.



competitive advantage in violation of each relevant cause of action stated above.[37]

224.   Plaintiffs have been damaged as a result of this unfair competition, both as a member of the class that is the subject of the unfair and untruthful advertising by the Activist Defendants, and as an individual pet store and owner that has lost money as a proximate result of the Activist Defendants' actions and unfair business practices.  Thus, Plaintiff is entitled to bring this claim individually and as a private attorney general on behalf of pet store owners and consumers.

225.   Defendants' unfair business practices include not only assertions that only they provide dogs that do not come from puppy mills, an assertion that is frequently untrue, but that Plaintiffs' puppies do come from such substandard breeders, also an untrue statement.

226.   Further, the Activist Defendants assert without any factual support that purchasing a puppy from San Diego Puppy or other class pet store will cause a shelter puppy to be euthanized.  This statement is untrue, but has enormous persuasive weight among the general public, with the result being a diminution of sales by San Diego Puppy and Oceanside Puppy.

227.   The statements were intended to and did funnel business from San Diego Puppy and Plaintiffs' other store, to the retail shelter or retail rescue organizations, where such organizations made a greater profit through increased sales.

---

[37] It is worth noting that the Chapter incorporating Business and Professions Code § 17200 is Chapter 4.  Chapter 4, § 17001 states:
§ 17001.  Legislative purpose

> The Legislature declares that the purpose of this chapter is to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition, by prohibiting unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair and honest competition is destroyed or prevented.



SCHLESINGER
CONRAD
LAW FIRM

228.   As stated above, the retail shelter or retail rescue organizations are charging more for puppies than for older dogs, but, on information and belief, are nevertheless able to make a profit on the sale of dogs by charging anywhere from $175 to $250 or even up to a $1000 for dogs that have been obtained at little to no cost by the retail shelter or retail rescue organizations.

229.   Among the goals of these competing retail shelter or retail rescue organizations is to completely remove any choice from the public as to where they obtain a companion pet, leaving the retail shelter or retail rescue organizations as the only choice. The goal is long-term, and being staged incrementally, but the unfair competitive tactics have singled out pet stores as a first step in the ultimate goal.  The oft-heard battle cry is "Don't Breed or Shop While Homeless Dogs Die".  However, this catch-phrase is not backed by fact; rather many of these retail shelter or retail rescue organizations are importing dogs to fill the need for pets in San Diego.  This is a concerted campaign of trespass, nuisance and violation of 42 U.S.C. § 1985 that constitutes an unfair business practice based as defined in Business and Professions Code § 17200, *et seq*.

230.   Accordingly, Plaintiffs seek damages and/or restitution in an amount to be determined at trial but not less than the jurisdictional minimums of this Court, *i.e.,* $75,000.

231.   Further, this campaign of unfair business practices was done specifically to injure Plaintiffs and destroy their reputation and business. The practices were done by an evil hand guided by an evil mind such that Plaintiffs are entitled to punitive damages against all Activist Defendants and DOES who are identified through discovery as participating in or directing such a campaign of destruction.

## ELEVENTH CAUSE OF ACTION
### (Nuisance)

(Against Activist Defendants San Diego Animal Defense Team, Animal Protection And Rescue League, Companion Animal Protection Society, Bryan Pease, San Diego Humane Society, and Fictitiously Named Defendants)

232.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 231 and each allegation asserted therein as though fully set forth here.

233.   Through the ongoing actions of gathering in front of the places of business controlled by Plaintiffs, the Activists Defendants have interfered and continue to interfere with the use of the business property that Plaintiffs have the right to use and hold.

234.   Plaintiffs' employees have been, and continue to be, harassed and annoyed.  As an example, employee Nancy Clem has received threatening phone calls at the store.  For example, in Early September, Ms. Clem answered the store phone, and was told "you are disgusting, why don't you die."  On another occasion, she was told to simply "die".  Another recent caller stated that the caller was a good shot and Ms. Clem should watch herself when she leaves the store.

235.   These actions interfere with the free use of the property that is legally in the custody and control of Plaintiffs, and which has not been opened to any group or individual for any purpose other than shopping and/or purchasing from San Diego Puppy and/or Oceanside Puppy.

236.   Plaintiffs are reasonably annoyed and harmed by such activities, specifically in that such activities create a tense atmosphere, appear threatening and have in fact threatened employees and customers, causing Plaintiff to lose business, in addition to the emotional distress, the loss of good will and loss of reputation.



237.   In light of the Facebook page and blog pages announcing additional protests by, *e.g.,* San Diego Defense Team, the actions by Activist Defendants are ongoing with more demonstrations planned for the stores owned by Plaintiffs.

238.   The harm caused by such activities far outweighs any public benefit as the averments by the Activist Defendants are not true, and cannot be supported.  Therefore no public benefit can be derived by the Activist Defendants' actions.

239.   As the protests and trespass were regular events at San Diego Puppy, and are now regular events in Oceanside, with more planned for National City, it is clear that the events will not abate or change substantially in character without a ruling from this Court.

240.   Although the police have been called when the protestors became particularly vicious or invasive, the police have done little to stop it, even telling San Diego Puppy employees not to proceed with a complaint when the protestors hit someone in the head with a sign.  Upon information and belief, a ruling from this Court would be sufficient to end the nuisance and ensure police help should the Activist Defendants violate the Court's order.

241.   As a direct and proximate result of the ongoing and persistent actions by Activist Defendants, and each of them, Plaintiffs have been harmed in a diminution of business, reputation and good will, as well as suffering emotional distress from being subjected to such activities on an ongoing basis.  Due to the unwarranted protests, "victory parades" and other threatening and disparaging activities and publications Plaintiffs have, in fact, been harmed.

242.   Accordingly, Plaintiffs seek a temporary injunction and/or restraining order, a permanent injunction, and damages in an amount to be

determined at trial but not less than the jurisdictional minimums of this Court, *i.e.,* $75,000.

**TWELFTH CAUSE OF ACTION**

(Injunctive Relief – Violation of California Civil Code § 52, *et seq*. "Ralph Act")

(Against All Activist Defendants)

243.   Plaintiffs re-allege and hereby incorporate Paragraphs 1 through 242 and each allegation asserted therein as though fully set forth here.

244.   Plaintiffs allege that the Activist Defendants, and each of them, acted against Plaintiff specifically because of animus against him and his businesses.  In so doing, they incited and encouraged radical and threatening conduct, including death threats and racial and other slurs.

245.   This conduct was based upon the Activist Defendants' inaccurate perception that anyone dealing in companion animals on a commercial basis is an animal abuser and worse.

246.   Plaintiffs had cause to believe, and did believe based upon being hit in the head with a sign, as well as the numerous vicious acts by various animal activist groups, and the recent naming of at least one animal activist group to the terrorism Watch List, that the Activist Defendants and/or their agents or members were capable of and would carry out the threats of physical harm against Plaintiffs.

247.   As a direct and proximate result of the Activist Defendants' actions, including targeting Plaintiffs for action by their groups and followers, Plaintiffs have a reasonable belief that the actions will escalate if not enjoined by this Court.

248.   Accordingly, Plaintiffs respectfully request that this Court issue a temporary injunction and/or restraining order prohibiting any contact

1  between Plaintiffs and the Activist Defendants, and/or anyone associated

2  with them, or any of them, pending a final resolution on the merits.

3      249.  Plaintiffs further are entitled to damages and cost of suit,

4  including attorney's fees.

5  PRAYER

6  **FIRST CAUSE OF ACTION**

7      1.    For a judgment declaring that the Ordinance is unlawful and

8  void as it violates Equal Protection, is overly vague and overly susceptible to

9  arbitrary and discriminatory enforcement;

10      2.    For a temporary injunction or temporary restraining order

11  prohibiting the City of San Diego from enforcing or attempting to enforce

12  the Ordinance until trial may be had on the merits and permitting San Diego

13  Puppy to carry on business at the San Diego location until that time.

14  **SECOND CAUSE OF ACTION**

15      1.    For a judgment declaring that the Ordinance violates the Due

16  Process Clause of the Fourteenth Amendment to the United States

17  Constitution and that the Ordinance is therefore unlawful and void;

18      2.    Plaintiff prays for a temporary restraining order and/or

19  temporary injunction to enjoin the City from enforcing, or threatening to

20  enforce the Ordinance pending this Court's ruling on the merits such that

21  San Diego Puppy is free to move back into the store located in San Diego;

22  attorney's fees and cost of suit, and such other and further equitable and

23  other relief as the Court deems to be just and proper.

24  **THIRD CAUSE OF ACTION**

25      1.    For a judgment declaring that the Ordinance violates the

26  Commerce Clause of the United States Constitution and, as such, is void and

27  unlawful;

28  / / /



2.     For a temporary injunction and/or temporary restraining order prohibiting the City of San Diego from enforcing or threatening to enforce the Ordinance until trial may be had on the merits, such that San Diego Puppy is free to move back into the store located in San Diego;

3.     For such equitable and other relief as this Court may deem just and proper.

### FOURTH CAUSE OF ACTION

1.     For damages in an amount to be proven at trial, but not less than the jurisdictional minimums of this Court;

2.     For treble damages;

3.     For costs of suit and attorney's fees.

### FIFTH CAUSE OF ACTION

1.     For a judgment declaring that the Defendant, City of San Diego, California has violated 42 U.S.C. § 1983 by depriving Plaintiffs of their rights secured by Equal Protection and Due Process Clause of the Fourteenth Amendment to the United States Constitution as a result of the Defendant's enactment and/or threatened enforcement of the Ordinance under color of state and/or local law.

2.     For damages, costs and attorney's fees pursuant to 42 U.S.C. § 1988, and for such equitable and other relief as this Court may deem just and proper.

### SIXTH CAUSE OF ACTION

1.     For a judgment declaring that the Defendant, City of San Diego, by and through its councilmembers Marti Emerald and Lori Zapf, has violated 42 U.S.C. § 1985 by conspiring to deprive Plaintiffs of their rights secured by Equal Protection and Due Process Clause of the Fourteenth Amendment to the United States Constitution as a result of the Defendant's enactment and threatened enforcement of the Ordinance under color of law.



1       2.      For of a temporary injunction and/or temporary restraining

2  order against enforcement of the Ordinance, pending trial on the merits;

3       3.      For damages against the City of San Diego, and punitive

4  damages against the Activist Defendants.

5       2.      For cost and attorney's fees pursuant to 42 U.S.C. § 1988, and

6  for such equitable and other relief as this Court may deem just and proper.

7  **SEVENTH CAUSE OF ACTION**

8       1.      For a judgment declaring that the Ordinance is unenforceable as

9  violating the Equal Protection rights of Plaintiffs as an entity [and/or class

10 of one plaintiff] engaged in the transfer of ownership of dogs and, thus

11 similarly situated to those entities that are exempted under the Ordinance,

12 as well as a violation of the (dormant) commerce clause;

13      2.      A temporary injunction and/or temporary restraining order

14 prohibiting enforcement of the Ordinance pending the outcome of trial on

15 the merits;

16      3.      For costs of suit herein plus attorney's fees, and such further

17 equitable and other relief as this Court may deem just and proper.

18 **EIGHTH CAUSE OF ACTION**

19      1.      For damages in an amount to be determined at trial but not less

20 than the jurisdictional minimums of this Court;

21      2.      For a grant of punitive damages against San Diego Animal

22 Defense Team, Animal Protection and Rescue League, Bryan Pease, and

23 Companion Animal Protection Society, and each of them;

24      3.      For costs of suit herein plus attorney's fees, and such further

25 equitable and other relief as this Court may deem just and proper.

26 **NINTH CAUSE OF ACTION**

27      1.      For a judgment pursuant to 28 U.S.C. §§ 2201, *et seq.,* that

28 declares the conduct by Activist Defendants to be unlawful;



2.      For a temporary restraining order and/or temporary injunction to enjoin the Activists from coming onto private property or within 1000 feet of David Salinas, his family or his businesses, his employees, or any of them, pending this Court's ruling on the merits;

3.      For a permanent injunction prohibiting the alleged conduct or acts that are threatening, harassing and/or interfere with a lawful business as more fully set forth in a final judgment; and

3.      For attorney's fees and cost of suit, and such further equitable and other relief as the Court deems to be just and proper.

### TENTH CAUSE OF ACTION

1.      For an award of damages in an amount to be determined at trial, but not less than the jurisdictional minimums of this Court;

2.      For an order of punitive damages; and

3.      For attorney's fees and cost of suit, and such further equitable and other relief as this Court deems to be just and proper.

### ELEVENTH CAUSE OF ACTION

1.      For a temporary injunction and/or restraining order, a permanent injunction, and damages in an amount to be determined at trial but not less than the jurisdictional minimums of this Court, *i.e.,* $75,000.

2.      For punitive damages; and

3.      For attorney's fees and cost of suit, and such further equitable and other relief as this Court deems to be just and proper.

### TWELFTH CAUSE OF ACTION

1.      For a temporary injunction and/or a restraining order against the Activist Defendants, and each of them, prohibiting further threats or actions against Plaintiffs, and restraining such Defendants from approaching Plaintiffs at their businesses, home, church or otherwise.

2.      For a permanent injunction;



3.     Damages in an amount to be determined at trial, costs of suit and attorney's fees. .

### ON ALL CLAIMS FOR RELIEF

1.     For a judgment permanently enjoining the Defendant, the City of San Diego, California, from enforcing, or threatening to enforce, the Ordinance;

2.     For a judgment permanently enjoining San Diego Animal Defense Team,  Animal Protection and Rescue League,  Companion Animal Protection Society, Bryan Pease, and San Diego Humane Society, their officers, agents or assigns from annoying, harassing, trespassing, threatening or otherwise violating the peaceful operation of the business owned by Plaintiff David Salinas, and from threatening, harassing or annoying any employee or officer of such businesses.

3.     For an award of reasonable attorney's fees and costs incurred in this action; and

3.     For such further equitable and other relief as the Court deems just and proper.

Dated: November 22, 2013          SCHLESINGER CONRAD LAW FIRM

                                  By:  /s/ Kira A. Schlesinger
                                       Kira A. Schlesinger
                                       Attorneys for Plaintiffs

Dated: November 25, 2013           CAROLYN CHAN, ESQ.

                                  By:  /s/  Carolyn Chan (signed with permission)
                                       Carolyn Chan
                                       Attorney for Plaintiffs



A PDF copy of the foregoing was ☒ E-filed ☐ Filed ☐Mailed ☐ Faxed ☐ Hand Delivered ☐E-Mailed ☐Mailed via Overnight Mail to the following on November 25, 2013:
Clerk of the Court
United States District Court, Southern District of California
ECF System

 Plaintiffs believe that all interested parties who have appeared in this action will be provided with a copy of this pleading and supporting documents through the ECF system. The appearing parties are represented by the following and a PDF copy of the foregoing was ☐ E-filed ☐ Filed ☐Mailed ☐ Faxed ☐Hand Delivered ☐E-Mailed ☐Mailed via Overnight Mail to the following on November 22, 2013:

TBD


By   */s/Kira A. Schlesinger*



## VERIFICATION

I, David Salinas, declare as follows:

1.    I am the principal for San Diego Puppy, Inc. and an individual plaintiff in the above-captioned action.

2.    I am over eighteen years of age. Except where sworn on information and belief, I have personal knowledge of the facts stated in the complaint. As to those matters sworn on information and belief, I have a reasonable basis to believe such facts are true. Should I discover otherwise during the course of litigation, I reserve the right to amend and/or supplement the Complaint at any time up to and including to conform to proof at trial.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this Verification was executed on

NOVEMBER 15 _____, 2013, at _____ San Diego _____, California.

David Salinas,
Individually and for
San Diego Puppy Inc.

TABLE OF EXHIBITS

Exhbit 1: A true and correct copy of the San Diego Puppy Guarantee

Exhibit 2: A true and correct copy of the San Diego Partner List

Exhibit 3: A true and correct copy of the SD Mun. C. § 42.0706

Exhibit 4: A true and correct copy of the Photo of Sign and examples of notices from shelters.

Exhibit 5:  A true and correct copy of the report from Chanel 10 News reflecting the importation Exhibit dogs from Romania by Helen Woodward Center, a San Diego City Partner (http://www.10news.com/news/orphaned-puppies-from-romania-up-for-adoption)

Exhibit 6: A true and correct copy of the website from Baja Rescue reflecting importation of dogs from Mexico (http://www.bajadogrescue.org/about-us/)

Exhibit 7: A true and correct copy of the Ordinance as Passed on August 5, 2013.

Exhibit 8: A true and correct copy of the San Diego Partner Information and Application.

Exhibit 9: A true and correct copy of the Letter from City Attorney's Office to Dan Smith threatening Mr. Smith with "aiding and abetting" violation of the Ordinance.

Exhibit 10: A true and correct copy of; (1) the Draft Complaint by City of San Diego; (2) Stipulation for Issuance;  and (3) Stipulated Injunction.

Exhibit 11:  A true and correct copy of the relevant pages from the USDA/APHIS Blue Book requiring face-to-face meetings before transfer of animal.

